## KNOXVILLE *v.* KNOXVILLE WATER CO.

### (*Knoxville.* ·  November  2,  1901.)

1. MUNICIPAL CORPORATIONS. *Notice to members of council of special meetings.*

It is a general rule that every member of a Municipal Council is entitled to reasonable notice of special meetings, and that no important action—*e. g.,* the passage of an ordinance on one of the required readings—can be lawfully done by such meeting unless such notice has been given, or unless the members not notified actually attend and participate in the business of the meeting. But failure to give notice to a member is excused when it was not practicable to do so. (*Post, pp. 655–666.*)

Cases cited: Land Co. *v.* Jellico, 103 Tenn., 321.

2. SAME. *Same.*

The giving of notice of a special meeting to a member of a City Council is excused as not being legally practicable, and the passage of an ordinance at such meeting, on its third and final reading, without his presence, is valid, where it appears that such member was, at the time of the holding and call of such meeting, three hundred miles distant, and outside the limits of the State, and that he had, for a considerable time, been engaged in regular employment outside the State, although he maintained his home in the city, visiting it occasionally, and attending special meetings of the Council when notified. (*Post, pp. 655–666.*)

3. SAME. *Mayor's power to call special meetings defined.*

The necessity and urgency of calling a special meeting of a City Council rests in the sole discretion of the Mayor, and the exercise of his discretion is not reviewable by the courts, where the city charter provides that he may call special meetings, whenever in his judgment the good of the city requires it. (*Post, p. 665.*)

Knoxville *v.* Knoxville Water Co.

4. SAME. *Publication of city ordinance on Sunday valid.*

Under the requirement of a city charter that its ordinances shall be "printed and published," the publication of an ordinance in a regular Sunday issue of a city paper is valid and sufficient. (*Post, pp. 666–670.*)

Cases cited: Lucas *v.* Larkin, 85 Tenn., 355; Amis *v.* Kyle, 2 Yerg., 31; Mosely *v.* Vanhooser, 6 Lea, 286.

5. GOVERNMENT. *Powers of, to regulate public utilities.*

It is settled law that the State, by direct enactment of its Legislature, or by authority delegated by the Legislature to counties or municipalities, may regulate public utilities, and the rates to be charged for public service by corporations or individuals rendering any service to the public. This doctrine has been applied, by the courts, to telephones, elevators, gas companies, water companies, and other public or quasi public utilities. (*Post, p. 671.*)

Cases cited: Crumbley *v.* Water Co., 99 Tenn., 420; Watauga Water Co. *v.* Wolfe, 99 Tenn., 430.

6. WATER COMPANY. *Regulation of rates of charges by city.*

The statute under and by authority of which the Knoxville Water Company was chartered and organized contained this provision, to wit: "And this Act is in no way to interfere with the police or general powers of the corporate authorities of such city. village or town, *and such corporate authorities shall have power by ordinance to regulate the price of water to be supplied by such company.*" The contract between the city of Knoxville and said water company, granting an exclusive privilege for thirty years, contained this stipulation, to wit: "Said company will supply private consumers with water *at a rate not to exceed five cents per hundred gallons.*" Subsequently said water company obtained the city's consent to consolidate with other companies upon its agreement to furnish water at certain "maximum" rates, not exceeding those stipulated in its former contract. Afterward, in 1895, the city, by ordinance, fixed a schedule of charges for water, upon the basis of which said company conducted its business until 1901, when the city fixed, by ordinance enacted pursuant to its power to regulate rates, a new schedule of charges, somewhat lower than those fixed in 1895. The water company denies the city's power to pass this last ordinance.

*Held:* The city had power to pass the ordinance of 1901, re-

ducing the charges for water below the rates fixed by the ordinance of 1895, and there being no contest as to the reasonableness of the rates fixed by the ordinance of 1901, the same is valid. The power of regulation conferred upon the city by said Act of 1877 is a continuing one, which is not exhausted by a single exercise of it, but may be exercised, within reasonable bounds, as often as the public interests may demand. (*Post*, *pp. 670–692.*)

7. SAME. *Same.*

If the power shall be conceded to the Legislature to authorize a municipal corporation to enter into a perpetual and irrevocable contract with a water company for a system of water works and supply of water, whereby such water company shall be and remain exempt from supervision, control, and regulation in the interest of the public, as regards the matter of its rates of charges for water, still, the grant of such authority must be plain, positive, and unequivocal. If there is reasonable doubt it must be resolved against the grant of such authority and in favor of the existence of the power of regulation. (*Post*, *pp. 670–692.*)

Cases cited: Harbison v. Iron Co., 103 Tenn., 421; Dayton v. Barton, 103 Tenn., 604; Leeper v. State. 103 Tenn., 503; Railroad v. Burke, 6 Cold., 50; State v. Martin, 2 Shannon, 555.

8. SAME. *Same.*

Where, under the statute and the contract of the parties, the city has the power to regulate the rate of charges by a water company, the latter cannot justly object that such power of regulation is unreasonable by reason of the fact that the city is one of the water consumers, whose rates are to be regulated, or because the city is interested to depress the value of the company's plant, in order to secure it at an unfair price, under an option which the company had voluntarily given to the city for its purchase. The company has its legal remedies for any wrongful conduct of the city and must pursue them. (*Post*, *pp. 688, 689.*)

9. SAME.

It is not a valid objection to a statute giving a city the power to regulate the rate of charges of a water company, that it contains no express provision, on its face, that such regulation shall be reasonable, and that the statute makes no provision for contesting or ascertaining the reasonableness of rates fixed by the city. The company's right to have judicial investiga-

tion of rates fixed exists, and can be enforced independently of any statutory authorization. (*Post, pp. 670-692.*)

## FROM KNOX.

Appeal in error from Circuit Court of Knox County. JOSEPH W. SNEED, J.

PICKLE & TURNER and J. W. CALDWELL, for Knoxville.

C. T. CATES, JR., for Water Company.

WILKES, J. This suit arises out of an effort upon the part of the city of Knoxville to enforce an ordinance which affects the defendant water company, and, as it claims, seriously interferes with its operations, and unlawfully encroaches upon its franchises and vested rights. The water company has a valuable plant at Knoxville, which it has erected and operated under contracts and ordinances made by the city of Knoxville, and it has valuable franchises in the furnishing of water to the city and people. The relative rights of the city and water company, and their obligations, one to the other, appear to have been drawn into sharp controversy, when the city, on March 30, 1901, passed and approved the ordinance, in controversy in this suit, specifying a maximum rate to be charged to con-

sumers by any firm or corporation in the city of Knoxville, and providing a high penalty for a violation of its terms and provisions as set forth in its third section, to wit:

" SECTION 3. *Be it further ordained*, That it shall be unlawful for any person, company, firm, or corporation, or their officers, agents, servants or employees, supplying water to the inhabitants of the city of Knoxville, to charge, demand, or collect for water so supplied more than the rates hereinbefore set forth in Section '1' of this ordinance; and it shall also be unlawful for any such person, company, firm, or corporation, or their officers, agents, servants, or employees to cut off or otherwise interfere with the supply, or refuse to furnish a supply of water to any consumer for failure to pay for same; *Provided*, such consumer tenders, in lawful money, the charge for such water at the rates aforesaid, and any violation of the provisions of this section of this ordinance shall be a misdemeanor, and upon a conviction thereof before the Recorder, the offender shall be punished by a fine of not less than $10, nor more than $50, for each offense."

The defendant company continued to charge the rates provided in a contract and previous ordinance of October 30, 1899, which (with the exception of some rates in the Lonsdale-Beaumont ordinance) were slightly in excess of the rates and charges provided in said ordinance of March 30, 1901, and thereupon this suit was instituted, and the defendant

was charged with unlawfully charging, demanding, and collecting of W. K. McClure, for water furnished and to be furnished him in the city of Knoxville, more than the rates fixed therefor by the ordinance of March 30, 1901.

McClure was the agent for J. S. Gratz, who then lived in the city of Chicago, but was the owner of three houses and lots in the city of Knoxville, and outside of the Tenth Ward. In 1896 the defendant company made a contract with Gratz to supply water to the premises owned by him, which contract is as follows:

"KNOXVILLE WATER COMPANY,

"Service No. 2850.

"Knoxville, Tennessee, Sept. 17, 1896.

"The undersigned hereby applies to the Knoxville Water Company for a supply of water at premises No. 706 High street, owned by J. S. Gratz, occupied by tenants, to be used for domestic purposes only, and I hereby agree to use and pay for the same in accordance with the rates, rules and regulations of the Knoxville Water Company as now, or hereafter in force, and which are made a part of this contract. And I further agree that said company may enter upon any land owned by me, and in which I may have such right and place therein, upon the terms provided therefor, all the pipes that may be used for furnishing such supply, and may cause the same to be inspected and repaired at any future time as occasion may require."

This contract was signed by J. S. Gratz by his agent, W. K. McClure.

The water in controversy was furnished to tenants living in the property owned by Gratz for whom McClure was agent, and who, as such agent, represented the owner Gratz in renting the property, and the bills were rendered to. W. K. McClure as agent, and paid by him in that capacity, but actually paid out of funds belonging to the owner, J. S. Gratz : and the bills so rendered for said water were in accordance with the rates prescribed by said contract and ordinance of October 20, 1899 ; the difference between the rates charged by defendant and paid by Gratz, through McClure, for the three premises to which the water in . controversy was furnished, and what would have been paid under the ordinance of March 30th, 1901, was $1.15, that is 50 cents, 42 cents and 23 cents respectively.

The first question presented is as to the validity of the ordinance of March 30, 1901, because of the manner of its passage by the City Council. The charter of the city of Knoxville provides that no ordinance shall become a law without first having been read and passed at three several meetings— that is, at three several regular meetings of the board, or at three several regular meetings, or valid "call," or "special" meetings, which the Mayor, by said charter, is authorized to call. The regular meetings of the Board of Mayor and Aldermen of the city of Knoxville are on the first and third

Friday nights of each month. The ordinance of March 30, 1901, was passed on its first reading at a special meeting on March 9, 1901; on its second reading, at a regular meeting on March 15, 1901; and on its third and final reading, at a special meeting on March 30, 1901. The Mayor and eleven Aldermen—that is, one Alderman for each ward, constitute the Board of Mayor and Aldermen of the city of Knoxville. At the special meeting of March 30, 1901, Alderman Cleage, representing the Sixth Ward, and Alderman Trigg, representing the Fifth Ward, were not present and were not notified, and no effort was made to notify them, nor did they have any notice or knowledge of said meeting. Alderman Trigg had removed from the city, and notice to him, it is conceded, was not necessary. Alderman Cleage was not present at the meeting of March 30, 1901, was not notified of that meeting, and had no knowledge thereof. When Alderman Cleage was elected an Alderman for the Sixth Ward of the city of Knoxville, he was then, as he was in March, 1901, residing with his mother, on Broad street, in the Sixth Ward of the city of Knoxville, but he was in the employ of the Southern Railway, with headquarters principally at Asheville. He was active in the discharge of his duties as an Alderman, attended nearly all of the regular meetings, and such special meetings as he had notice of, and was usually informed by telegram of special meetings, and had attended as many as three special

meetings in one week, coming more than a hundred miles to do so. No effort was made to notify Alderman Cleage of either of these special meetings.

On request for a finding of facts, the trial Judge found that it was practicable to have given Alderman Cleage notice of these special meetings, and that it was practicable for him to have attended the meeting of March 9, 1901, and that no emergency existed for the passage of the ordinance in question at these special meetings.

The first assignment of error we consider is that the trial Judge erred in holding that the Mayor was bound to give Alderman Cleage notice of the special meetings of March 9 and March 30, 1901, these being the dates when the ordinance in question was passed on its first and third readings, and for failure to give such notice the ordinance is void. The contention is that said Cleage was out of the city and State and not within summoning distance, and no personal notice to him of said meetings was practicable, and, therefore, the action of the Council without notice to him was not thereby invalidated. In support of this assignment authorities are cited. The fact that Alderman Cleage was not notified of the meeting, and that no attempt was made to notify him, fully appears, and is not controverted.

The general rule is that every member of a municipal council is entitled to reasonable notice of special meetings, and that no important action can

be lawfully done by such meeting unless such notice has been given, or unless the members not notified actually attend and participate in the business of the meeting. *Land Co.* v. *Jellico*, 19 Pickle, 321.

It is said that the rule is quite rigidly stated in that case, but that, conceding it to lay down the general doctrine, still there are exceptions to such general rule and that one of these exceptions excuses notice when it is not practicable to give it, and for this proposition is cited in the printed brief. 1 Dillon on Mun. Corp., Sec. 286; 1 Beach on Pub. Corp., Sec. 271; 15 Enc. L. (1st Ed.), pp. 1034, 1035.

Other authorities are cited as applicable to cases of private corporations and inferior municipal and school boards which we think we need not consider. As bearing upon the main question, it is suggested that it has never been the custom in Knoxville to give notice to each and every one of the board of special meetings; that Cleage had virtually removed himself from the State, so that service upon him was impracticable; that in the case of *Land Co.* v. *Jellico*, 19 Pickle, 320, it appeared that the alderman who was not notified was in the building where the meeting was held, and the inference might be that he was purposely omitted from the notice as he was hostile to the ordinance that was considered, and the meeting was at the instance of the persons interested in the passage of the ordinance, while in this instance, as afterwards developed, Alderman Cleage

was in favor of the ordinance, and would have voted for it if he had been present at the meeting.

We pass over these and minor exceptions and proceed to consider the merits of the first assignment.

In 1 Dillon on Municipal Corporations (4th Ed.), Sec. 286, it is said: "If the meeting of the council be a special one, the general rule is, unless modified by the charter or statute, that notice is necessary and must be personally served if practicable upon every member entitled to be present so that each one may be afforded an opportunity to participate and vote."

In Section 263 it is said: "A notice when necessary, must, if practicable, be given to every member who has a right to vote when the act is one to be done by a body consisting of a definite class or classes, and it must be given by or issued by some one who has the authority to convene a corporate meeting.

"But notice may be altogether dispensed with or its necessity waived by the presence and consent of every one of those entitled to it. It must.be served personally upon every resident member, or left at his house. If temporarily absent it may be left with his family, or at his house or last place of abode. An order to serve all is not sufficient. All, if practicable, must be served, but if the party entitled to notice has entirely quit the municipality and

has no family or home within its limits, notice is not necessary."

In Section 264, it is said, among other things: "Such great importance is attached to notice, that it can only be waived by universal consent, but if every member of a select body be present at a regular or stated meeting, or at a special meeting, they may, *if everyone consents, but not otherwise,* transact any business, ordinary or extraordinary, though no notice was given, or an insufficient notice, but the *unanimity of consent should clearly appear from their recorded declarations, acts or conduct.* . . If the charter imperatively requires a special notice it cannot be waived even by the consent of all."

In 1 Beach on Public Corporations, Sec. 263, it is said: "When a meeting is assembled for a special purpose every member who has a right to vote is entitled to notice unless he has quit the municipality without retaining a home or leaving his family within its limits. . . . .It must be personally served upon him, but in case of his temporary absence it may be left with his family or at his last place of abode." Again, Sec. 271: "Every member entitled to be present at a special meeting is entitled to notice of the time and place thereof, which must be served upon him personally if practicable, or unless some other mode of notice is prescribed by the statute or charter." For all these propositions, authorities are liberally cited.

In 15 Am. & Eng. Encl. L., 1035, it is said : . . . . . . "A meeting held at any other time than that fixed for a regular meeting under a resolution of the council, or a special meeting under the call of the Mayor is a legal meeting if all its members actually attend and participate in its proceedings, and it is otherwise regular."

In *Lord* v. *Anoka*, 36 Minn., 176, it was held that under the charter of the defendant a special meeting of the city council is not valid unless called by the Mayor by written notice to each member of the council, delivered to him personally or left at his usual place of abode ; or unless all the members, at least all who are not notified, are present at the meeting." And in *Beaver Creek* v. *Hastings*, 52 Mich., 528, it is said notice may be dispensed with or waived by the presence of everyone entitled to it.

In *Paola Railroad* v. *Commissioners*, 16 Kan., 302, holding that the acts of a board of county commissioners at a special meeting were invalid because all members were not notified, Mr. Justice Brewer said : "The statute providing for the sessions of the county board is found in Sec. 13, p. 256 of the general statutes. That section, after providing for the meeting of the board in regular session, adds : 'And any special session on the call of the chairman, at the request of two members of the board, and as often as the interest of the county may demand.' This is the only statutory provision

on the subject. It does not specify whether the call shall be verbal or in writing, how long prior to the meeting it shall be made, or require a record to be preserved of it. And the same is true as to the request. But still it requires a call, and the call of the meeting, in the legal sense of the term, is a summons to the parties to meet, directing them to meet. It involves something more than a mere purpose in the mind of the caller or an expression of that purpose unheard, unseen and unknown. It implies a communication of that person to the parties to be affected by it. How it shall be communicated is sometimes prescribed by the statute or by-law. It is sometimes provided that it shall be by publication in a newspaper; sometimes by printed notice served personally or at the residence, and sometimes by mere oral personal service. But in some way or other notice must be given; and if there be no regulation as to the manner of notice, it must be personal notice. This is no new question. It has arisen in respect to the sessions of common councils of cities, boards of directors or trustees of private corporations; the town meetings of New England, the meetings of most of corporations, boards of directors, etc., and there is but one uniform rule running through the authorities. In the case of *Rex* v. *Mayor, etc., of Shrewsberry*, Rep. Temp. Hard., 151, it was said by the Court that "when the acts are to be done by a selected board, notice must be given of the time of special

Knoxville *v.* Knoxville Water Co.

meetings." It was a saying of Lord Kenyon's that special notice must be given to every member who "has a right to vote."

In regard to County Boards, it is said: A special session of the board has no power to transact business unless it has been called in the manner provided by law, and notice of the meeting is in all cases essential. 7 Am. & Eng. Enc. L. (2d ed.), 979, note 2, citing among other cases, *Pike Co.* v. *Rowland*, 94 Pa. St., 238, which holds that if the meeting be special, notice is necessary, and it must be personally served, if practicable, upon every member entitled to be present.

In *People* v. *Batchelder*, 22 N. Y., 129, is was held that the election of the Clerk of the First District Court was void, because five absent Aldermen had no notice of the convention. Mr. Justice Selden, for the Court, said: "It is not only a plain dictate of reason, but a general rule of law, that no power or function entrusted to a body, consisting of a number of persons, can be legally exercised without notice to all the members composing such body."

The case of the *State* v. *William Kirk*, 46 Conn., 397, is somewhat obscurely reported, but, as we read it, it appears that William Kirk was elected Street Commissioner of the city of Bridgeport, on April 8, 1878. It appears that he had been previously elected to the same office, but the exact date does not appear. He insisted that he was legally elected on April 8, but if that contention

was not correct, he was rightfully in office as a holdover from his former election. It appears that at the first election one member of the board was not notified. The Court held that a good reason was shown why actual notice was not given. The member absent was not only gone from the State, but his whereabouts appears not to have been known until afterwards. Notice in writing was left at the store of his son, where he was in the habit of visiting every day when he was in town. The Court said no other notice could well have been given, and the law never required impossibilities. But in the same case it appeared that by the charter the Mayor was, *ex-officio*, a member of the board, and its chairman, and entitled to preside. He was not notified of the meeting, and it was held that the meeting was illegal, although he had no vote except in case of a tie. And it appeared that in the particular instance he would have had no vote. The report of the case, as furnished us, is not satisfactory, but it clearly appears that the Mayor might have been notified and was not, and the meeting was adjudged illegal; while, in the other case, the member could not be found, and hence was not notified, though all was done that could have been done, and it was impossible to do more.

The finding of the trial Judge, which was asked for by the plaintiff, as to Alderman Cleage, contains, among other statements not important in this

Knoxville *v.* Knoxville Water Co.

connection, the following: "At the time of his election as an Alderman of the city of Knoxville, and on March 9, 1901, and March 30, 1901, he was in the employ of the Southern Railway Company, as law agent, with his headquarters at Asheville, in the State of North Carolina, and transacted his business principally in the States of North Carolina and South Carolina, and outside the limit of the State, his territory including about five hundred miles of railroad. His duties require him to go in person over his territory, investigating, reporting, and adjusting claims for damages against said railroad company; that during the months of February, March, and April, he was more than usually busy in the discharge of his duties, but retained his home in the Sixth Ward of the city of Knoxville, and was active in the discharge of his duties as an Alderman; that he attended nearly all the regular meetings of the Council, and nearly all the special meetings of which he had notice; that it was impracticable for him to have been present on March 30, 1901, at the special meeting on that date, but it was not impracticable to have given him notice of that meeting; that it was not impracticable to have given him notice of the meeting of March 9, 1901, but it does not appear that it was impracticable for him to have attended that meeting; that there was no emergency for this ordinance to be considered at special meetings of March 9 and March 30, 1901, and as a public servant and official he had a right

to have notice of these meetings, but notice was not given him, and, therefore, this ordinance of March 30 is invalid."

There are various exceptions to the finding of the trial Judge, but we think we need notice only one or two of them.

In the tenth subdivision of the third assignment of errors, it is said: "He (the trial Judge) erroneously found that it was practicable to have given Cleage notice of the special meetings of March 9, and March 30, 1901, and that it does not appear to have been impracticable for him to have attended the meeting of March 9. There was no evidence to support this finding. It was contrary to all the evidence on the subject. Cleage was beyond the limit of the city and State, his exact whereabouts were unknown to the officials of the city, and the facts and circumstances, as shown by Cleage as well as his direct testimony to the fact, all show to the contrary of the Court's "finding on this question." This assignment, that there is no evidence to support the finding of the trial Judge, requires us to go behind that finding and look into the record and see whether there is any evidence on which to base it. In this connection it may be remarked that the question whether notice was or was not practicable, is one of mixed fact and law. It appears from the testimony in the record, that each call for a special meeting on March 9, and March 30, 1901, was for a meet-

ing to be held on the night of the same day the call was made, that is, on the night of March 9, and March 30, respectively. It clearly appears from the evidence of Alderman Cleage that on both of these days he was beyond the limits of the State. He cannot identify particularly the exact places where he was on the ninth, but he was at some point on his territory, all of which was outside the limits of the State. He is very positive and definite that on March 30, 1901, he was in North Carolina at the extreme end of his territory, about three hundred miles from Knoxville.

We are of opinion that when a member of the Council removes from the State or is continuously absent from the State, and when he is shown to have been absent from the State and beyond reach on the occasion and at the time of the call, as appears in this case, it is not *legally practicable* to give him notice of call meetings. As to the necessity and urgency of such called meetings, the Mayor must be the judge. In this case it appears that action was desired at the time in order to put the new ordinance in force before the beginning of another quarter, when current bills for water would be payable in advance. As to the sufficiency of this urgency, it is not incumbent on us to determine. The charter provision is that the Mayor may call special meetings whenever, in his judgment, the good of the city requires it.

Tested by these rules which make the question as to whether or not notice was practicable, one of mixed law and fact, we think the evidence is that notice of these special or call meetings was not legally practicable to have been given to Alderman Cleage. Morever, it appears that if he had been notified of the call of March 30, as soon as possible after it was made, it would not have been practicable for him to have attended the meeting of that day as he was about three hundred miles from the City of Knoxville. This, however, we consider of no practical importance.

The ordinance not being invalid because of the manner of its passage, we proceed to consider the the other question presented in the record.

It is further objected to this ordinance that it is invalid and inadmissible in evidence because it was published in a Sunday newspaper. It appears that the ordinance, by authority of the city, was published in the Sunday issue of the *Journal and Tribune*, a morning daily paper of the City of Knoxville, on March 31, 1901. It further appears that since 1866 Sunday editions of the daily paper have been published in this city and that these editions are the largest and most important, have the largest circulation, and are the best advertising mediums of any of the daily issues of the paper.

By the charter of the City of Knoxville, Acts, 1885, special session, Ch. 8, Sec. 28, it is pro-

vided: "This Act is declared to be a public Act, and may be read in evidence in all courts of law and equity, and all ordinances, resolutions, and proceedings of the Board of Mayor and Aldermen may be proved by the seal of the corporation, attested by the Recorder, and when printed and published by the authority of this corporation, the same shall be received in evidence in all courts and places, without further proof, when certified to by the Recorder."

This is the only requirement as to the publication of ordinances.

We have been cited to quite a diversity and collection of authorities, bearing more or less upon this feature of the case. It has been held in Tennessee that the acknowledgement of a deed by a married woman, with her privy examination, is valid, though made on Sunday. *Lucas* v. *Larkin*, 1 Pickle, 355.

It is said contracts in Tennessee made on Sunday have never been held by our Supreme Court to be void. It is held by the Federal Courts, construing Tennessee statutes that they are valid. *Swann* v. *Swann*, 23 Fed. Rep., 299, citing *Amis* v. *Kyle*, 2 Yer., 31; also notes to Shannon's Code, § 3029.

As applied to newspaper publications, which may be regarded as process, they are held void, just as any other judicial proceedings on Sunday are invalid, under the rule, both at common law and by statute

above stated, that Sunday is *dies non juridicus.* 17 Enc. Plead. & Prac., 102. The leading case cited in support of this text is *Schwed* v. *Hartwitz*, 22 Col., 187 (S. C., 58 Am. St. Rep., 221.) This holds that the publication of a notice of a tax sale is in the nature of service of process, and if it takes place in a Sunday edition of a newspaper, it is void. The same holding upon the same ground is made in the case of *Sawyer* v. *Cargille*, 72 Ga., 290, which is another tax sale case. See note to 24 Enc. Law, 577. But no other notice or publication made on Sunday, unless specially prohibited by statute, is void.

"In *Hastings* v. *Columbus*, 42 Ohio St. Rep., 585, it is held that the publication of a preliminary and other ordinances of street improvement, which were required to be made in a newspaper of general circulation, may be made in a paper published only on Sunday." This case is directly in point.

" Where there is a stipulation between private parties that notice shall be given by publication of ten days, publications on Sunday may be counted." *Kingsbury* v. *Buckner*, 71 Ill., 514. Cited in note 1 to 24 Encl. L., 1 Ed., 577.

"In South Carolina it is held that notice of escheat is not a process, such as is meant that Sunday is *dies non*, nor when published in a newspaper on that day, is it served on that day. The statute forbidding the service of civil process on Sunday does not make such process void." *Eason* v. *Wil-*

*fcoskey*, 29 S. C., 239. Cites in note 24 Encl. L., 1 Ed., 575.

"Notice to a consignee, given on Sunday, of the arrival of a cargo is valid." *Lake* v. *Hurd*, 38 Conn., 540.

"And notice to quit is not invalid because given on Sunday." *Sangster* v. *Noy*, 16 L. T. (N. S.), 157; 24 Encl. L., 1 Ed., 579.

"So, too, an enlistment made on Sunday is valid." *Walton* v. *Garvin*, 16 Q. B., 48.

The statute laws of the different States are so variant, that we can derive but little aid from their holdings. It is further said the validity or the invalidity of an act done on Sunday does not rest upon religious or moral grounds, or upon public policy, but solely upon the question as to whether it violates the provisions of the law, either statutory or common. *Swann* v. *Swann*, 21 Fed. Rep., 299. *Mosely* v. *Vanhooser*, 6 Lea, 286.

It is the purpose of the publication of an ordinance like that in question to bring it to the attention of the public, and it appears that the publication in a Sunday newspaper is the most effective notice that could be given in the City of Knoxville. If it accomplished the very purpose intended by the requirement, to publish the act, and there is neither public policy or forbidding statute to be contravened by the act of publication, it seems that no grounds could be suggested why this publication is not good. We think this is the correct view, notwithstanding

the very able and ingenious argument made by counsel and backed up by many authorities of high respectability, among which may be cited: *Ormsly* v. *City of Louisville*, 75 Key, 197 (S. C., 4 Am. & Eng. Corp. Cases, 842); *Duman* v. *City of Denver*, 65 Prac. Rep., 580; *Sewall* v. *City of St. Paul*, 20 Minn., 511; *Scammen* v. *City of Chicago*, 40 Ill., 146; *Schwed* v. *Hartwitz*, 23 Colo., 187. Many of these cases could be distinguished, but, after all, there is a conflict of authority arising largely from a difference in the Sunday laws of the several States.

We are content with the conclusion we have reached as being the most practical and at the same time free from any valid legal objection.

In order to properly appreciate the very serious questions presented on the merits, it is necessary to give a short resume of facts bearing upon the history of the Water Works Company and its connection with and relation to the City of Knoxville. A condensed statement of these facts, as given by counsel and which we find substantially correct, is as follows:

By the charter of the City of Knoxville, as compiled from former Acts, and as embodied in the Acts of 1885, Special Session, Chapter 8, Section 18, Subsection 7, the Board of Mayor and Aldermen is authorized by ordinance "to provide the city with water by water works, within or beyond the boundaries of the city, or provide for supplying the city with water otherwise."

The Knoxville Water Company was chartered and organized under Act of 1877, Chapter 104, amendatory of the Act of 1875, Chapter 142. Section 2 of that Act provides that "such charter shall not be granted until after leave to operate under the same shall have been first had and obtained from the corporate authorities of the city, town or village in which it is proposed to operate such water works, and such leave shall be certified by the Mayor or Recorder upon the application, and registered with it. And *this Act is in no way to interfere with the police or general powers of the corporate authorities of such city, village or town, and such corporate authorities shall have power by ordinance to regulate the price of water to be supplied by such company.*" It is insisted, and as we think correctly, that it has been settled that the State, by direct enactment of its Legislature, or by authority delegated by the Legislature to counties or municipalities, may regulate public utilities, and the rates to be charged for public service by corporations or individuals, rendering any service to the public. This doctrine has been applied to elevators, telephones, gas companies, water companies and other public or *quasi* public servants.

The leading case on this subject is that of *Munn* v. *Warehouses*, 94 U. S., 183. See, also, *Turnpike Co.* v. *Croxton*, (Ken.) 23 L. R. A., 177, and extensive note thereto, reviewing the various cases on the subject; R. R. Commission cases, 116 U. S., 307,

347, 352; *San Diego Water Co.* v. *San Diego* (Cal.), 62 Am. St. Reports, 261, and extensive note thereto, reviewing many cases on the subject, p. 289; *Danville* v. *Danville Water Co.* (Ill.), 69 Am. St. Reports, 304; *Rogers Park Water Co.* v. *Fergus* (Ill.), 69 Am. St. Reports, 315; *Crumbley* v. *Water Co.*, 15 Pick., 420; *Spring Valley Water Co.* v. *Schottler*, 110 U. S., 347 (S. C., 28 L. Ed., 173); *Watauga Water Co.* v. *Wolfe*, 15 Pick., 430; *Rushville* v. *Rushville Natural Gas Co.*, 15 L. R. A. and note.

That such power may be delegated to a municipality, see *San Diego Water Co.* v. *San Diego, supra;* 15 Am. & Eng. Enc. L. (1 Ed.), p. 1167.

On July 1, 1882, an agreement was entered into between the City and the Water Company in regard to the erection by the latter of water works, and the supplying for a period of thirty years, the City and its inhabitants with water, in which, among other things, it is stipulated by Section 7 "said company will supply private consumers with water at a rate not to exceed five cents per hundred gallons."

This contract provides as follows :

"2. The City further obligates itself not to grant to any other person or corporation, any contract or privilege to furnish water to the City of Knoxville, or the privilege of erecting upon the public streets, lanes or alleys, or other public grounds for the purpose of furnishing said City or the inhabitants thereof with water for the full period of thirty

years from the first day of August, A. D. 1883.''
A further statement of facts is as follows:

On April 18, 1891, an ordinance was enacted by
North Knoxville, constituting an agreement between
it and Wheeler & Parks, for the latter to supply
said town and its inhabitants with water until June
3, 1913, and by Section 9 of that ordinance it was
provided that water to be furnished private con-
sumers shall be charged for at ''not exceeding the
rates contained in the following schedule,'' and then
sets out said schedule of rates.   That contract was
subsequently assigned to the Knoxville Water Com-
pany by Wheeler & Parks, and the town of North
Knoxville became consolidated with and incorporated
into, the City of Knoxville.

On September 17, 1892, an ordinance was enacted
by the City of West Knoxville, constituting an
agreement between it and the Lonsdale-Beaumont
Water Company for the supply of water to said
town and its inhabitants by said company for a period
of twenty years in which it was provided among
other things, by Section 9, that said company shall
not charge consumers during the continuance of the
franchise granted by said ordinance " exceeding the
following maximum annual rates,'' etc., and then
sets out the schedule of such rates.   Said contract
was subsequently assigned by said Lonsdale-Beaumont
Water Company to the Knoxville Water Company,
and the town of West Knoxville became consolidated
with, and incorporated into, the City of Knoxville.

23 P—43

On October 20, 1899, an ordinance was passed by the City of Knoxville, then embracing the territory of North and West Knoxville, authorizing said Knoxville Water Company to take the assignment of said contract of the Lonsdale-Beaumont Water Company, to supply water to the inhabitants of the territory of West Knoxville, upon certain conditions, among which was, that they should furnish to the inhabitants of such territory water at a maximum "rate not exceeding that fixed in the ordinance and contract of September 17, 1892," and further, that they should supply to the inhabitants of the balance of the City of Knoxville, water "at a maximum rate, not exceeding that fixed by the contract of July 1, 1882, and the schedule of rates and charges now in force and operation by the Knoxville Water Company."

On May 17, 1895, the City passed an ordinance regulating the supply of water by meter, and fixed the rates and charges therefor to private consumers, and these rates were incorporated into the schedule of rates of the defendant in force on October 20, 1899. On July 27, 1900, the City passed another ordinance regulating and fixing the rates generally to be charged to consumers of water at a lower rate than that fixed by the schedule in force on October 20, 1899, and repealed all former ordinances in conflict therewith. Again, on March 30, 1901, the City re-enacted this ordinance of July 27, 1900, with slight amendments, fixing the same schedule of water

rates as those set out in the ordinance of July 27, 1900.

The present suit arises under the last ordinance. The question of whether the rates fixed by the ordinance in question are reasonable has been pretermitted in the proof and not considered in this case.

It is insisted that it has been held that, when the power to regulate rates for public service of a public corporation is delegated to a city, the city becomes invested with such power as a public trust, and cannot divest itself thereof by contract. *Huron Water Co.* v. *Huron* (8 Dak.), 30 L. R. A., 848; *Ogden City* v. *Ogden Water Co.* (Utah), 41 L. R. A., 305. Again, the State (and of course a city) cannot contract away its police power, or limit its exercise by contract, and this is conceded. *Bowman* v. *R. R. Co.*, 125 U. S., 465; *Stone* v. *Miss.*, 101 U. S., 814; *Butcher's Co.* v. *City Co.*, 111 U. S., 746; *Gas Co.* v. *Light Co.*, 115 U. S., 50; *Mugler* v. *Kansas*, 123 U. S., 624; *New York* v. *Mila*, 11 Peters, 139. But it is denied that such a case is presented in the one at bar.

The matter of controversy in this case will first be treated from the standpoint of a contract, outside of the operation of the police powers of the municipality. Treating the regulation of rates, as a matter of contract, it has been held that a "charter specification of rates which it shall be lawful for a turnpike company to charge, subject to certain increase

or decrease, if necessary to keep the company's dividends within certain limits, does not constitute an irrevocable contract between the State and the corporation, but is merely an indication that such rates are supposed to be reasonable, without precluding the subsequent exercise of legislative power to change the rates." *Turnpike Co.* v. *Croxton* (Ky.), L. R. A., 177. See notes to this case for a general discussion.

In the case of *Danville* v. *Danville Woter Co.* (Ill.), 69 Am. St. Rep., 304, the Court held:

"The Legislature has the power to regulate the rates at which water shall be supplied to the public by a water company, especially where such right is reserved by the statute under which said company was incorporated.

"Municipal corporations can exercise only such powers as are conferred upon them by their charters. All persons dealing with them must see that they have power to perform the proposed act.

"The statute empowering a city to authorize a private corporation to construct water works, and to contract for a supply of water for a period not to exceed thirty years, gave no power to the city to bind itself by fixing a rate at which it must pay for such supply for such entire period, and an ordinance fixing the rate for the entire thirty years is void.

"Although a city has been empowered by statute to authorize a private corporation to construct water works, and to contract for a supply of water, not

to exceed thirty years, a subsequent statute empowering any city in which a private corporation has been, or may be authorized to supply water for public use, to fix reasonable water rates, is constitutional, and an ordinance passed under the later statute reducing existing water rates, and fixing them at a reasonable price, is valid, although the city enacting it has, under the earlier statute, attempted by ordinance to fix water rates at a certain figure for the entire unexpired period of thirty years." *Danville* v. *Danville Water Co.*, 69 Am. St. Rep., 304. "To the same effect see the decision in the case of *Rogers Park Water Co.* v. *Fergus*, 178 Ill., 571, cited in note to the foregoing case at p. 315. It is there held that an ordinance fixing the rates for the full period is merely a declaration that such rates are reasonable at the time when the ordinance was enacted, and that the City is not bound to recognize such rates as reasonable for the full period, and has power to fix the water rates so as to make them reasonable at any time, or from time to time, as changed conditions may effect the reasonableness of the water rates formerly established, and that mandamus will lie at the suit of a citizen to compel the water company to furnish him with water at the changed rates, provided they are reasonable."

In the case of *San Diego Water Co.* v. *San Diego*, from California, 62 Am. St. Rep., 261, the power to regulate water rates is recognized and

enforced with the like qualification that they must be reasonable.

"The case of *Rogers Park Water Co.* v. *Fergus*, cited above, and of *Danville* v. *Danville Water Co.*, and also the additional case of *Freeport Water Co.* v. *Freeport*, all from the Supreme Court of Illinois, were taken by writ of error to the Supreme Court of the United States, and on March 25, 1901, were affirmed." 21 Supreme Court Reporter, 490, 493, 505. "In these cases the Supreme Court of the United States held that municipal corporations may be invested by statute with the power to bind themselves by an irrevocable contract and to regulate rates, but such power must be conferred in explicit terms, and that a contract concerning governmental functions, as one which affects the right of a city to regulate rates of a water company, must be strictly construed, and such functions cannot be held to have been contracted away by doubtful or ambiguous provisions, and further, that an ordinance granting an exclusive franchise to the water company, with the right to use the streets, requiring the municipality to pay certain rentals, and binding the company, among other things, to furnish an adequate supply of water, does not give a contract right to charge the rates named in the ordinance for the whole period of the franchise, by virtue of the provision that the grantee "shall charge the following annual rates to consumers during the existence of this franchise," as this is merely a

regulation of the right to charge rates, and does not amount to a stipulation that no other regulation will be made during the term of the franchise.''

It will be seen from an inspection of these cases that the Supreme Court was divided in opinion, the minority relying upon the cases hereafter cited by the defendant as controlling. This difference, as we understand it, extends not only to the question of the power of the State to authorize an irrevocable contract, but likewise whether the regulation of rates is within the police power.

In a very able and exhaustive argument, counsel for the Water Company insists that the ordinance of March 30, 1901, impairs the obligations of prior contracts made by the city with the defendant company, and is therefore void, and in support of this contention are cited: Constitution United States, Sec. 10, Art. 1; Constitution State of Tenn., Sec. 20, Art. 1; *New Orleans Water Works Co.* v. *Rivers*, 115 U. S., 674; *New Orleans Gas Light Co.* v. *Louisiana*, 115 U. S., 650; *St. Tammany Water Works Co.* v. *New Orleans Water Works Co.*, 120 U. S., 64; *Walla Walla* v. *Walla Walla Water Co.*, 172 U. S., 1; *Los Angeles Water Co.* v. *Los Angeles*, 177 U. S., 570; *Santa Anna Water Co.* v. *Town of, etc.*, 56 Fed. Rep., 671; *Bank of Ill.* v. *Akron City, etc.*, 76 Fed. Rep., 671; *Old Colony Trust Co.* v. *City of Atlanta*, 83 Fed. Rep., 42; *Los Angeles City Water Co.* v. *Los Angeles*, 88 Fed. Rep., 720; *City of Cincinnati* v. *Cameron*, 38 Ohio, 380; *Cable Co.* v.

---

---

*Baltimore*, 66 Fed. Rep., 140; *Los Angeles Water Co.* v. *City of Los Angeles*, 103 Fed. Rep., 711; *Crosby* v. *City Council of Montgomery*, 108 Ala., 498; *State, ex rel.,* v. *Laclede Gas Light Co.*, 102 Mo., 472.

We do not deem it necessary to comment upon all these authorities, but will notice some of those most relied upon and most nearly in point.

The case of *Los Angeles Water Co.* v. *Los Angeles*, 177 U. S., 570, is much relied on.

Attention is called to the fact that Justice McKenna, who delivered the opinion in the Los Angeles case above cited, delivered the opinions in the Illinois cases, *supra*, and he rested it upon the ground that express authority had been granted to Los Angeles to enter into a contract limiting its power to regulate water rates. It is said on p. 470 of the opinion, that "it is not denied that the city had the power to regulate rates."

"The contract of July 22, 1868, with the Water Company provided that the Mayor and Common Council of said City shall have, and do reserve, the right to regulate the water rates charged by said party of the second part, or their assignees, provided that they shall not so reduce water rates or so fix the price thereof, as to be less than those charged by the party of the second part for water." Pp. 560, 570. On April 2, 1870, the Legislature for California passed an act, held in that case to be valid, ratifying and confirming said contract. Pp. 561,

571.   It is, therefore, held that since the city had entered into this contract by such legislative authority, and that the contract did not grant the power to regulate rates, which power was ·already existent, but was a contract to limit that right, the city had no power by ordinance to violate it.

" It will be further observed that this case arose under acts and contracts made before the adoption of the Constitution of California, of 1879, providing for the regulation of water rates.    P.  567.

" In the case of Old Colony Trust Co. v. City of Atlanta, 83 Fed. Rep., 39, it is held that the City could not regulate street car fares, because no such power had ever been delegated to the City.   The City asserted such power under the provisions of its own charter, and also those of the charters of the street car companies, but the Court, upon construing those charters, held that they granted no such power.

" The charter of the street car company granted certain franchises and privileges to the company, 'provided that the rates and fares on said railroad shall be subject to the approval of the Mayor and City Council of the City of Atlanta.'   In the city ordinance granting to this company the use of the streets, etc., it was provided that the charges for passage on said road shall not exceed twenty cents for any through line, and ten cents for half lines or short distances.

" The Court declines to express an opinion as to whether this constituted a contract between the city

and the company, but said that if the proviso in the railroad company's charter granted any power to regulate, it was exhausted upon its first exercise. But the Court does not determine what effect would be given to a direct grant of power to the city to regulate fares, instead of this mere reservation out of the franchises granted to the railroad company, and further held that the power to approve, such as was reserved in this charter, is not equivalent to the power to regulate and fix rates. See p. 24.

"The case of *Santa Anna Water Co.* v. *Town of Buena Ventura*, 56 Fed. Rep., 339, simply holds that the Constitution of California of 1879, requiring annual regulation of water rates, would not avoid a valid contract previously entered into by a city, with a water company, authorizing a water company to fix its own rates. The case has no application to the questions involved in the present case."

The case of *Walla Walla* v. *Walla Walla Water Co.*, 172 U. S., 1, is a case somewhat peculiar in its facts. By an act of the Territory of Washington, incorporating the City of Walla Walla, it was enacted that it should have power to provide a supply of water and to grant the use of the streets for a term not exceeding twenty-five years, provided none of the rights and privileges herein granted shall be exclusive nor prevent the council from granting the same rights to others.

The City, in pursuance of this Act, passed an or-

Knoxville *v.* Knoxville Water Co.

dinance in 1887, granting the Company the right to lay, place, and maintain all necessary water mains, pipes, connections and fittings in all the highways, streets and alleys of the city for the purpose of furnishing water. In 1893, it passed another ordinance to provide a system of water works of its own, and one of the questions presented was its power to pass the latter ordinance. The Court said: "The case upon its merits depends largely upon the power of the City under its charter. The ordinance authorizing the contract, which purports to have been passed in pursuance of the charter, declared that until such contract be avoided by a court of competent jurisdiction, the City would not erect, maintain or become interested in any water works except the ones established by the Company, while the ordinance of June 20, 1893, provided for the immediate construction of a system of water works by the City, for the purpose of supplying the City and its inhabitants with water. Upon the face of the two ordinances there was a plain conflict; the latter clearly impaired the obligation of the former. The City contended that the original ordinance was beyond its power to make; first, because it created a monopoly not authorized expressly or impliedly by legislative grant, and was void as being in contravention of public policy; second, that it was an attempt to contract away a part of the governmental powers of the City Council, and for other reasons which we need not notice.

The Court held that as the original contract was

limited to twenty-five years, and was not an exclusive grant, that it was not beyond the power of the City Council; that if it had been exclusive it would have been a monopoly and objectionable, unless authorized by express sanction of the Legislature. The Court further held that the contract would be void if it interfered with the police power of the City, and this police power extended to the peace, good order, health and morals of the inhabitants, and if deleterious to them it might be controlled by the City, or the contract entirely abrogated under the police authority of the City; but the Court held that the matter of the contract did not fall within the police power, but the contractual power of the City.

In the case of the *State, ex. rel. City of St. Louis* v. *The Laclede Gas Light Co.*, 102 Mo., 472, 483, the charter of the company granted by the State authorized the company to fix the price of gas manufactured by it, and it was held that such price could not be diminished by subsequent legislative action, State or municipal. It was further held that the regulation of the price of gas by the State or by municipalities created by it is not the exercise of a police power, which cannot be abrogated by contract. . . . . . . . It may be said that under the grant from the Legislature in the Missouri case, it was intended to remove the company from the exercise of the police power of the State over it, in so far as its rates of charge were concerned.

While not assenting to the views expressed in that case, we think this case clearly distinguishable from the present one under consideration, in that the Legislature in the Missouri case intended to put the question of rates beyond future control of the State or municipality and beyond its police regulation, while in the present case, under Sec. 2 of the charter, it was clearly intended to keep the question of rates under control and to treat them as subject to police supervision.

Under the cases we have cited and others that might be collated, it is, we think, apparent that the authorities are not agreed as to whether the State can by legislative grant empower a municipality to enter into an irrevocable and perpetual contract with a water company or other private or quasi public corporation for a system of water works and a supply of water, and whether such company can by legislative grant be removed from the supervision of the police power of the municipality, yet we think there is no question but that in order to do so the legislative grant must be unquestionable and admit of no other construction, but must be plain, positive and unequivocal. If the municipality has no such power under legislative grant, it can make no such contract, nor can it waive its police powers or refuse to exercise them when the good of the citizens of the municipality demands.

What matters fall within the scope of the police powers of the State or of a municipality has never

been definitely determined.   A large number of sub-
jects have been embraced, such as the public health,
the public morals, the public safety, and the gen-
eral and comprehensive clause of the public welfare,
and after the enumeration of all the subjects under
these and other general heads, the text books
announce that there are also other instances.   Dif-
ferent jurisdictions lay down different rules and limits.
In *Theilan* v. *Porter*, 14 Lea, 626, "the safety and
tranquility of the community and the orderly exist-
ence of the government is included in the enumera-
tion."   As to what may be done under this power,
see generally Dillon on Municipal Corporations, p.
95, Sec. 71, N. 141, 142, 244, 314, 752, note
p. 920; 8 Ency. L., 1 Ed., 620, 624; 18 Ency.
L., 1 Ed., 752. *Harbison* v. *Iron Co.*, 19 Pick.,
423; *Leeper* v. *The State*, 19 Pick., 503; *L. &
N. R. R. Co.* v. *Burke*, 6 Col., 50; *State* v.
*Martin*, 2 Shannon, 555; *Dayton* v. *Barton*, 19
Pick., 604.

It was said in *Stone* v. *Mississippi*, 101 U. S.,
814: "No Legislature can bargain away the pub-
lic health or the public morals."

While the rate to be paid for water is not so
palpably a regulation within the police supervision
of a city, as is the purity and supply of the
water furnished, yet the rate of charge is a matter
which affects the health, welfare and comfort of the
city, since if rates are unreasonably high they will
prove a restriction upon the use of water, which

may seriously impair the health and interfere with the comfort and welfare of the people, especially the poorer classes, who, by reason of high prices may be cut off from the benefit of the water, partially or altogether.

The case of *Los Angeles City Water Co.* v. *Los Angeles*, 88 Fed. Rep., 720 (S. C., 177 U. S., 558), is relied on to show that a city may waive or renounce its right to regulate water rates, but, ar we have before stated, it appears that express authority was given to that City in its charter to entes into a contract limiting its power to regulate rates, the language of the charter being in substance that the City may regulate the rates "*provided they shall not so reduce such water rates or so fix the price thereof as to be less than those now charged by the parties of the second part (the water company) for water.*"

But the difference in that case and the present is, that by the charter of Los Angeles, the city had the express power to make an irrevocable contract, while in this case, the city of Knoxville is not by its charter granted such a right, but the proper construction of the charter is, we think, that the City shall have a continuing right to regulate the charges for water, limited only by a condition that such rates shall not be unreasonable and oppressive. As before stated, this question of reasonableness or unreasonableness of rates is not considered in the present case, but seems to have been waived by consent.

It is said that it is unreasonable to give to the City of Knoxville the right to regulate the water rates of the Company when it is itself the principal party to be affected by such rates, and in this connection the language of Mr. Justice Jackson in Cleveland Gas Light & Coke Co. against the City of Cleveland, 71 Fed. Rep., 614, is cited as follows:

"It would be a fearful proposition, monstrously absurd and outrageous, if the Legislature which undertook to confer upon a citizen of Cleveland, the right to say at what price services should be rendered to him, or what he should pay for goods and articles furnished him. There is hardly any law in this land that would make the party being furnished the judge of the price that he should pay, or would say that his arbitrary decision should fix the rights of the parties. The city of Cleveland has undertaken to do that thing. . . . The thing cannot be done, and ought not to be done." 71 Fed. Rep., 614. But the fallacy, as we think, in this argument lies in the fact that the question of the reasonableness or unreasonableness of the rates is always open to judicial investigation, and while it may safely be said that the Legislature cannot constitutionally delegate the power to fix prices at which water shall be sold in a city by the authorities of the city, which is itself a consumer, either in its municipal capacity or through its inhabitants, without liability to a judicial investigation of the reasonableness of the rates fixed by such authorities. Still, if

no such provision is made in an ordinance, the law will imply one and preserve to the Company its right to litigate the question upon that ground. We do not think it necessary that the provision be incorporated in the contract or in the ordinance, but it will be implied when not expressly · provided for.

It is said in addition that the City has an option to purchase the plant after 1898, and the argument is made that the city authorities by oppressive legistion and ordinances may make the plant unproductive and less valuable in order to secure it at less than it is worth, but in answer to this we think we can safely say the defendants may protect themselves against such action and results by a recourse to the courts, and protection against ordinances which are intended to, or do, have such results. No such case is before us now, as the question of the income and profits of the Water Company has not been opened nor considered, and the naked question here being the power to regulate the rates as the City in its judgment may deem right and just.

Recurring again to the provision in the second section of the charter, Act of 1877, Ch. 104, we think that ·its proper construction is, that nothing in it and no power granted by it to the corporation to contract for and provide water shall in any way interfere with the police or general powers of the city, and it expressly provides that such corporate authorities shall have power by ordinance to regulate the price of water to be supplied by such company.

23 P—44

It is to be noted that defendant's counsel insist that the proper construction of Section 2 of the charter of the city is that, while the city originally had the power to regulate the price of water to be supplied by the Company, it is not a continuing right, but that, having once exercised it, its power was exhausted, and having once made a contract for a certain schedule of rates it is bound by such contract. The contention is forcibly put as follows:

The City was the "master of the situation:" If it chose to refrain from making a contract, it might exercise the power of regulation, limited only by what would be unreasonable and oppressive. But if it should exercise the power vested in it, and specially conferred upon defendant company, and enter into a contract with said company for the use of water, and agree upon price for the us- of such water, then it became bound by that prevision of the Constitution of the United States, which is written into every contract that it is sacred from alteration, change or impairment except with the consent of the other party. And it is said: If such were not the case, what City could persuade parties to invest their capital in improvements, which, to be profitable, must either be permanent or continue for such a length of time as to enable the investor to receive some return upon the amount invested by him? A different construction would be disastrous to the interest of the City.

In *Freeport Water Co.* v. *Freeport*, 21 Supreme

Court Reporter, 498, it is said: "This power of regulation is a power of government continuing of its nature, and if it can be bargained away at all, it can only be by words of positive grant, or something which is in law equivalent. If there is reasonable doubt it must be resolved in favor of the existence of the power."

In the words of Chief Justice Marshall, in *Providence Bank* v. *Billings*, 4 Peters, 514, 561, L. Ed., 939, 955, its abandonment ought not be presumed in a case in which the deliberate purpose of the State to abandon it, does not appear. In that case the term used was "*at such rates as may be fixed by ordinance.*" It was said, the words "*fixed by ordinance*" may be construed to mean by ordinance once for all to endure during the whole period of thirty years, or by ordinance from time to time, as might be deemed necessary. Of the two constructions that must be adopted, which is the most favorable to the public? not that one which would so tie the hands of the Council that the rates could not be adjusted as justice to both parties might require at a particular time.

The language of the City charter in the present case is not that the corporate authorities shall have power by ordinance *to fix, but to regulate* the price of water to be supplied by such company, and in the same connection the full police and general powers of the corporation are reserved to it.

We are of opinion that the right to regulate rates

was not exhausted by an agreement at any particular time upon a schedule of prices, but it is a continuing right under the terms of the charter, but not to be exercised arbitrarily and unreasonably, and when rates are so reduced as to become oppressive upon the company, and so as not to yield a fair income on the investment, the Court can interfere upon a proper showing and restrain such action. As has been very tersely said: a reasonable rate the law assures, even against governmental regulation. 21 Sup. Court Rep., 497, *Rogers Park Co.* v. *Fergus;* 21 Sup. Court Rep., 498, *Freeport Water Co.* v. *Freeport.*

The rates adopted by the ordinance are not shown by the proof to be unreasonable, and the ordinance is not shown to be oppressive, and its violation subjects the defendant to the penalties imposed.

The judgment of the Court below is reversed, and judgment will be entered in this Court as herein indicated.