KNOXVILLE GAS CO. v. CITY OF KNOXVILLE et al.

(Circuit Court of Appeals, Sixth Circuit. November 5, 1919.)

No. 3249.

1. GAS ⏍14(1)—CHARGES FIXED BY FRANCHISE CONTRACT CANNOT BE INCREASED, UNLESS UNREMUNERATIVE FOR ENTIRE FRANCHISE PERIOD.

Where a franchise contract was made between a city and a gas company for a definite term of years, and a maximum rate in form agreed upon, if it be assumed that both parties were expressly empowered so to agree, the company cannot subsequently have the rate changed to meet changing conditions, on the ground that the rate has become confiscatory, in the absence of proof that performance of the contract, taking all the years of the term together, will prove unremunerative.

---

⏍For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

2. GAS ☞14(2)—POWER TO FIX RATES RESIDES IN STATE UNTIL SURRENDERED.

The power to fix rates to be charged by public service corporations, as gas companies, is governmental, and resides primarily in the state, and municipalities cannot exercise such power, unless the state has in fact surrendered its power in that behalf.

3. GAS ☞14(2)—STATE'S SURRENDER OF POWER TO FIX RATES MUST BE UNEQUIVOCAL.

It is the settled federal rule that a state's surrender to a municipality of power irrevocably to fix rates for a public service corporation must appear in explicit and convincing terms, and all doubtful expressions are to be resolved in favor of the state and against surrender of the power.

4. GAS ☞14(2)—STATE'S SURRENDER OF POWER TO FIX RATES NOT SHOWN.

Neither the Knoxville Charter, which gives the mayor and board of aldermen control of the streets, nor the Tennessee General Corporation Act of 1875, under which complainant gas company was incorporated, section 25 of which, as amended by Acts 1887, p. 302, provides that no streets of a city shall be used by gas company for laying pipes and mains until consent of the municipal authorities shall have been obtained, nor the further amendatory act of 1889 (Acts 1889, p. 97), delegated to the city of Knoxville the power of the state to regulate rates to be charged by a public utility, as a gas company, and hence a franchise contract entered into between the complainant and the city of Knoxville fixing the rate could not in that respect be enforced by the city when by reason of changed conditions the rate fixed was not compensatory.

5. GAS ☞14(2)—SURRENDER BY STATE OF POWER TO FIX RATES MUST BE SHOWN BY EXPLICIT STATUTE.

The rule of decision of the court of last resort of Tennessee held to require surrender by the state to municipalities, of its power to fix rates of public utilities to be shown by explicit statutory language.

6. INJUNCTION ☞85(2)—ENFORCEMENT OF INVALID ORDINANCE FIXING RATES MAY BE RESTRAINED.

Where a municipality attempted by penal ordinances and otherwise to force a gas company to sell its product at a rate fixed in the franchise ordinance, though the franchise contract was not binding in that respect, because of the municipality's want of power irrevocably to fix the rates of public utilities, held, that the gas company is entitled to injunctive relief.

Appeal from the District Court of the United States for the Eastern District of Tennessee; John E. McCall, Judge.

Suit by the Knoxville Gas Company against the City of Knoxville and others. From a decree denying it an injunction, or other relief (253 Fed. 217), complainant appeals. Reversed and remanded, with directions.

The Knoxville Gas Company appeals from a final decree denying it an injunction or other relief to prevent the city of Knoxville from interfering with the company's exaction of an increase in price of gas. The case was disposed of upon the pleadings, with certain exhibits and affidavits presented by the respective parties, and upon certain agreed facts appearing in recitals of the decree. The bill was dismissed at plaintiff's costs, and for reasons appearing in the reported opinion below. 253 Fed. 217. In view of the facts there stated, it cannot be necessary to set out the details here. The salient facts and resulting issues are these:

(1) In March 1903, pursuant to Tennessee statute, plaintiff was organized as a corporation under its present name to establish and construct gasworks at Knoxville, subject to the duty to build and equip a gas manufactory sufficient to supply with gas the corporate authorities and inhabitants of the city; to lay down pipes and extend conductors through the streets, lanes,

and alleys of the city, provided that none of the streets or alleys should be "entered upon or used" by the company "for laying pipes or conductors * * * until the consent of the municipal authorities shall have been first obtained, and an ordinance shall have been passed prescribing the terms on which the same may be done"; to manufacture and vend gas and to exact a reasonable price therefor, but never "more than one cent per every cubic foot of gas used," nor more from the city than is received "at the same time from the people."

(2) The city adopted an ordinance September 8, 1903, in terms granting to plaintiff the right to construct and operate gasworks within the city, and the right of way in the streets, etc., to place and maintain gas mains, etc., "for furnishing gas for lighting, power and fuel," and "consent" was "given for the entry upon and the use of all the streets * * * for the aforesaid purpose"; also, in lieu of the foregoing, granting permission to the company "to acquire by consolidation, purchase, lease, or otherwise, the gasworks, mains, pipes, conductors, or other property of the Knoxville Gaslight Company, now located and carrying on operations" in the city, "and to maintain, carry on, operate, enlarge, and continue the same" in the city, "and that approval and consent thereto be and the same is hereby granted." This was subject, however, to certain requirements imposed on the company, among which were (section 7) to pay the city a graduated percentage of the gross sales of gas, which at the time this suit was brought had reached the maximum, 5 per cent.; also to furnish gas of a given candle power to consumers within the city at a price not more than $1.10 per thousand cubic feet, less 10 cents per thousand, if paid by the 10th of each succeeding month of supply. The rights and consent so given were to continue for a period of 50 years from date of ordinance. Provision was made that any violation of the restrictions imposed should work a forfeiture, and that doing anything forbidden or failure to do anything required by the ordinance should be a "misdemeanor and punishable as other like offenses against said municipality"; and, further, that unless the company should within 20 days accept the ordinance all rights should be forfeited. Later in the same month, September 28th, the city adopted another ordinance, amending the first one by fixing times for payment of percentages on gross sales, providing that intentional violation of the conditions or restrictions set forth in section 7 of the first ordinance should work a forfeiture of the rights granted, and also constitute a misdemeanor, and be punishable as other like offenses against the municipality. This ordinance, like the other, required acceptance within 20 days; and the company notified the city, in writing, on the date of passage of the last ordinance, of its acceptance of the first ordinance, and its terms and provisions, as amended by the second one.

(3) The plaintiff availed itself of the "in lieu" provision of the ordinance of September 8, 1903, giving the city's permission and consent to acquire the property of the old Knoxville Gaslight Company, secured a transfer thereof by deed of October 1, 1903, and thereafter and until the filing of the present bill, June 27, 1918, the company "conformed its rates and charges to the maximum limit prescribed," and paid to the city "the franchise taxes as provided," by the ordinances; but in 1917, the date not being stated, the company petitioned the city to be "allowed an increased rate" for its gas, and proposed that the city employ an expert accountant to examine the company's books "with a view of ascertaining the net income of the company," and whether it was "entitled to charge a higher rate for gas by reason of the greatly increased cost of operation." The city selected an accountant, who, under date of February 4, 1918, made an elaborate report to the city officials, purporting to show, among other things, the assets and liabilities and the profit and loss of the company for the year 1917, also its profit and loss from 1904 to 1916, inclusive, and cost of fuel from 1913 to 1917, inclusive, together with bond and stock accounts.

(4) Precisely what the city did in respect of this report does not appear; but on March 5, 1918, the city adopted an ordinance forbidding, under penalty of "not less than five dollars nor more than fifty dollars," any person or corporation "supplying any article of public utility * * * to any

consumer or patron, intentionally to demand, accept, or charge any unlawful rate or charge, for the public utility article or service rendered or required to be rendered under its contract or franchise with the city of Knoxville to a consumer or patron."

(5) The present litigation followed, and attention may now be turned to the issues. According to the bill, the price fixed for gas in September, 1903, has never produced income adequate to meet expenses of operation, current depreciation, and necessary renewals of the gas plant, and yield a reasonable return upon the investment; and in substance it is alleged that, under the conditions occasioned by the World War, the cost of materials and labor had been so greatly increased as to impose actual loss in the operation of the gas plant; that the value of the plant is $1,400,000; that it is necessary, and plaintiff intends, to increase the charge for gas to $1.50 per 1,000 cubic feet, less the present rate of discount, in order to secure a fair and reasonable return on the value of the property "during the present prevailing high prices of labor and materials"; that any interference with the collection of such increased price will be to deprive plaintiff of its property without due process of law and to take it for public use without just compensation, in violation of the Fifth Amendment and the Fourteenth Amendment to the Constitution of the United States. The prayer is for an injunction or other proper relief, to prevent the city, through enforcement of its ordinances of September, 1903, and March 5, 1918, or otherwise, to interfere with the company's collection of the proposed increase in price.

In the opinion of the company's general manager, whose affidavit was used as evidence at the hearing, "it would cost $1,000,000 or more to replace" the plant. Plaintiff introduced the report of the city's expert accountant, showing that the book value of the gas property on October 1, 1903, was $617,116.17; that additions have since been made, so as to bring up the total value (apparently book value) on January 1, 1918, to $947,443.59; that the cost of fuel in 1917 was more than 100 per cent. in excess of the cost in 1916; that the average profit of the company "for 13 years, 1904 to 1916," was $14,031.31, or 4.67 per cent. on the common stock, and for the year 1917 it was 1.63 per cent. The expert states in his affidavit that the existing rate of $1.10, less the 10-cent discount, "will not yield sufficient income to meet the operating expenses and fixed charges" of the company, and so will not "render any return whatsoever to the company upon the value of its gas plant and property and capital invested" in Knoxville.

The answer, in addition to matters of formal character, contains allegations and denials in varying forms designed to refute the averments of the bill respecting the claimed value of the gas property and privileges, the claimed increase in cost of materials and labor involved in the manufacture, supply, and distribution of gas, and the alleged inadequacy of the price of gas as fixed by the ordinances of September, 1903, and at last challenges the jurisdiction of the court. In support of the answer, and in contradiction of plaintiff's proofs, defendants presented at the hearing two affidavits of the mayor of Knoxville.

The evidential weight of the respective showings so made does not appear to have been considered below; indeed, it appears in the decree that, "assuming the facts be as stated in the bill and exhibits thereto and in the affidavits" of the company's general manager and the city's expert, plaintiff was not entitled to the relief sought, because it was bound "by its contract with the defendants." See, also, last paragraph of opinion, 253 Fed. at page 224.

H. B. Lindsay, of Knoxville, Tenn., for appellant.

Charles T. Cates, Jr., of Knoxville, Tenn., for appellees.

Before WARRINGTON, KNAPPEN, and DENISON, Circuit Judges.

WARRINGTON, Circuit Judge (after stating the facts as above).
[1] The controlling question is whether in 1903 the city of Knoxville

possessed the power by contract irrevocably to fix the maximum price of gas for a term of 50 years. If the city in reality had the power, the decree must be affirmed; for, in the first place, the rights and obligations in terms created under the ordinances of September, 1903, will not expire for over 30 years, and, in the next place, despite the complaint made of the World War conditions, it is not shown that performance of the ordinance provisions, taking all the years in contemplation together, "will prove unremunerative." Columbus Railway, Power & Light Co. v. City of Columbus, 249 U. S. 399, 414, 39 Sup. Ct. 349, 354 (63 L. Ed. 669), opinion by Mr. Justice Day.

We assume that the passage of the ordinances by the city and their acceptance by the company in 1903 amounted to a binding contract between the parties as to all matters falling clearly within their respective corporate powers. In view, however, of the issue touching the price-fixing feature, it is necessary to consider whether the city could by contract of substantial duration and providing a maximum price for the supply of gas, bind the gas company, on the one hand, to accept this price in the face of intervening changes in conditions fairly calling for distinct increase in price, and commit the inhabitants of Knoxville and the municipality itself, on the other hand, to pay the price (for such quantities of gas as they might use) in spite of conditions obviously justifying material reduction in price. This is what the power claimed means; and the far-reaching consequences that well might attend its execution, as respects both the consumer and the company, certainly demand the closest scrutiny into the disputed existence of the power.

[2, 3] The power to establish prices to be charged by public service corporations, whether it is to be exercised by regulation or by contract, resides primarily in the state—here, the state of Tennessee. Admittedly it is capable of being delegated by the legislative branch of a state to its municipalities. Efforts to define the power with precision, and to differentiate it from other municipal powers, have often been made under questions of whether it had in reality been delegated and rightly exercised; but they have failed to establish any rule of uniform acceptance and application. It is enough for present purposes to say that the character of the power is governmental, and that the consequent importance of conserving it is manifest; indeed, in the absence of specific provision to the contrary, it is to be interpreted as a power continuing in nature and incapable of being bartered away. Can it be safely said, then, that the state of Tennessee has both surrendered part of its own power and, in effect, authorized the city of Knoxville to exercise it by contract? The settled federal rule in respect of both these features is exacting, and need not be misunderstood; it requires that the intent of the state so to give up a portion of its power must appear in explicit and convincing terms—in plain words—and that doubtful expressions shall be resolved in favor of the state.

Mr. Justice Moody said, in Home Telephone Co. v. Los Angeles, 211 U. S. 265, 273, 29 Sup. Ct. 50, 52 (53 L. Ed. 176):

"It has been settled by this court that the state may authorize one of its municipal corporations to establish by an inviolable contract the rates to

be charged by a public service corporation (or natural person) for a definite term, not grossly unreasonable in point of time, and that the effect of such a contract is to suspend, during the life of the contract, the governmental power of fixing and regulating the rates. * * * But for the very reason that such a contract has the effect of extinguishing pro tanto an undoubted power of government, both its existence and the authority to make it must clearly and unmistakably appear, and all doubts must be resolved in favor of the continuance of the power."

Later, in applying the rule as thus expressed to the power to fix street railway rates, in Milwaukee Elec. Ry. v. Wisconsin R. R. Comm., 238 U. S. 174, 180, 35 Sup. Ct. 820, 822 (59 L. Ed. 1254), Mr. Justice Day said:

" * * * It has been uniformly held in this court that the renunciation of a sovereign right of this character must be evidenced by terms so clear and unequivocal as to permit of no doubt as to their proper construction."

[4] The certainty thus required, in language claimed to authorize a municipal corporation to barter away sovereign power, is exacted also by a number of adjudications pointed out in these two decisions. Further, the same rule has been laid down in Tennessee. In Knoxville v. Knoxville Water Co., 107 Tenn. 647, 672–674, 64 S. W. 1075, 61 L. R. A. 888, it appears that in 1882 a contract was made between the city and the water company, under which the company was to erect waterworks and for 30 years to supply water to the city and its inhabitants; that the company afterwards secured assignments of contracts which had been made by others for the supply of water in North Knoxville and West Knoxville, and, after their annexation to the city of Knoxville, the city in 1899 sanctioned these assignments. Provision was made in all the contracts for supplying water at specified maximum rates. However, in 1901 the city of Knoxville passed an ordinance reducing rates, and, the company declining to accept them, the city brought an action to recover penalty for charging and collecting water rates in excess of those fixed by the ordinance of 1901. This involved the question whether the old rates could rightfully be reduced. Recovery of the penalty was permitted, and in the course of the opinion, after stating in substance that the authorities were not in harmony as to the power of a municipality to enter into an irrevocable contract with a water company in effect removing it "from the supervision of the police power of the municipality," it was said (107 Tenn. 685, 64 S. W. 1085, 61 L. R. A. 888):

"Yet we think there is no question but that, in order to do so, the legislative grant must be unquestionable and admit of no other construction, but must be plain, positive, and unequivocal."

The decision was affirmed in Knoxville Water Co. v. Knoxville, 189 U. S. 434, 438, 23 Sup. Ct. 531, 47 L. Ed. 887. Further reference to these decisions is necessary, but we wish first to point out the statutory provisions of Tennessee, which are here relied on to sustain the contention that the city was clothed with power to bind itself by contract as to the price of gas.

No legislative provision has come to our attention which expressly grants this power to the city of Knoxville specially or to the munici-

palities generally. What is claimed is that, in virtue of certain charter and statutory provisions, the city was invested with power to control the streets, to grant franchises therein to public utility corporations, and to give consent to occupy the streets for gas purposes, either through original construction of a plant, or acquisition and use of an existing plant, upon such terms and conditions (not violative of any law) as it might impose, and that the right thus to make or refuse a grant, or to give or withhold consent, necessarily implies power to prescribe by ordinance as a condition, among others, of the grant or consent, a maximum price for a distinct term, which price and term upon the company's acceptance of the ordinance become part of a binding contract. It will be convenient, even at the expense of space, to set out the apposite portions of the statutes upon which the insistence of counsel is based; accordingly they are shown in the margin.[1]  It is to be observed

[1] Special charter powers of Knoxville—Acts 1885 (Extra Session) p. 54: "Sec. 18. The mayor and board of aldermen shall have the following powers by ordinance: * * * [Art. 8] To make appropriations to open, alter, abolish, widen, extend, establish, grade, pave, or otherwise improve, clean, and keep in repair streets, alleys and sidewalks * * * and * * * for lighting the streets. * * *" (See, also, section 38 as to certain exclusive power in the board of public works, though of no importance here, as to construction, etc., of streets and lighting public places. Id. p. 62.) "To grant the right of way through the streets * * * for the purpose of street or other railroads, and for such other purposes as the board of aldermen may provide by ordinance." Id. p. 57, art. 29.
Prior to date of Knoxville charter, and in accordance with the Constitution of 1870, art. 11, § 8, the General Assembly enacted what is called the General Corporation Act (Acts 1875, p. 232), providing (section 25, at pages 261, 262) form of charter for a gas company, directing insertion therein of names of incorporators, name of corporation and of city in or near which it was proposed to establish and construct gasworks, and expressly authorizing and empowering the company so incorporated "to lay down pipes and extend conductors through the streets, lanes, and alleys" of the city named, "in such manner, however, as to produce the least possible inconvenience" to the city, its inhabitants, or to travelers, and "to charge a reasonable price for said gas, not higher than the price allowed by existing charters to gas companies heretofore chartered in this state: Provided, that said company shall never charge more than one cent per every cubic foot of gas used * * * nor shall they ever charge the authorities of said town, city, or village more per cubic foot than they are getting at the same time from the people."
This section (25) of the act was amended in 1887 (Acts Tenn. p. 302), by adding the following: "And provided further, that no one of the streets or alleys of said city shall be entered upon or used by said company for laying pipes and conductors, or otherwise, until the consent of the municipal authorities shall have been first obtained, and an ordinance shall have been passed prescribing the terms on which the same may be done."
It was in pursuance of the foregoing statute of 1875, as amended in 1887, that the Knoxville Gas Company secured its charter in 1903, as above pointed out in the statement. In 1889, however, Acts Tenn. pp. 97, 98, a statute was passed providing: "Sec. 1. That hereafter it shall not be lawful for any corporation chartered * * * to manufacture or furnish, or furnishing gas * * * for the lighting of the streets * * * of any town or city, or for the use or consumption of the inhabitants of such town or city, nor any corporation chartered to supply or supplying any town or city or the inhabitants thereof with water to acquire the franchises or property of any other similar corporation located or carrying on its operations with-

of these provisions that, although the General Assembly itself express-
ly authorized chartered gas companies to charge a reasonable price
for gas, not exceeding the price allowed by existing charters or a maxi-
mum price therein definitely named, yet nothing distinctly reciprocal to
this was vested in the cities. Authority to make prices by contract, or
even by way of regulation, touching the supply of gas, is nowhere ex-
pressed among the municipal powers. Thus the claim of power in the
city to agree upon a price for gas supplied throughout the life of
the ordinances of 1903, must at last rest on the right created in
the city in general language to impose terms and conditions of its
consent to use the highways, rather than upon language specifically
authorizing it either to regulate prices or to agree upon a price. The
effect of such a claim is to ask that there be read into the statutes lan-
guage which the Legislature did not see fit to enact.

True, as counsel point out, in Detroit v. Detroit City Str. Ry. Co.,
184 U. S. 368, 22 Sup. Ct. 410, 46 L. Ed. 592, when speaking of section
34 of the Tram Railway Act of 1861 (Acts Mich. 1861, No. 14), pro-
viding that a railway corporation organized under the act "could not
construct a railway through the streets of a city without the consent
of the municipal authorities, 'and under such regulations and upon such
terms and conditions as said authorities may from time to time pre-
scribe,'" Mr. Justice Peckham expressed views favorable to the right
of the city thereunder to enter into contracts as to rates. 184 U. S. 383,
384, 22 Sup. Ct. 410, 417 (46 L. Ed. 592). That statute and the views
so expressed, however, were not relied on as the basis of the power
to contract, the learned Justice saying it was "unnecessary to conclu-
sively determine the question"; and, on the contrary, the ruling that
the rates could be fixed by contract was rested on express power creat-
ed by sections 20 and 29 of the Street Railway Act of 1867 (Acts 1867,
No. 35). 184 U. S. 385, 22 Sup. Ct. 417, 46 L. Ed. 592:

"By the twentieth section of the latter act it was provided that the rates
of toll or fare, which any street railway may charge for the transportation
of persons or passengers over its road, should be established by *agreement* [2]
between the company and the corporate authorities of the city or village
where the road is located, and should not be increased without the consent
of such authorities."

In Knoxville Water Co. v. Knoxville, supra, 189 U. S. at page 437,
23 Sup. Ct. 531, 47 L. Ed. 887, Mr. Justice Holmes, when distinctly re-
ferring to the ordinance involved in the Detroit case, said:

"* * * The ordinance was under a statute which declared that the
rates should be established by *agreement* [3] between the city and the railway
company."

in any city or town in this state, or partly in such city or town, and in the
territory adjacent to the same, by consolidation, purchase, lease, or in any
other way or mode, except only by and with the permission and by and with
the approval and consent expressed officially in writing of the municipal
government of the city or town in which such corporations respectively are
located, or carry on their business wholly or in part, and then only upon
such terms and conditions as the said municipal governments may respec-
tively prescribe; provided, that such terms and conditions shall not violate
any law."

[2] Italics ours.                    [3] Italics ours.

Again, the basis of the decision as to contractual rates in Cleveland v. Cleveland City Ry. Co., 194 U. S. 517, 24 Sup. Ct. 756, 48 L. Ed. 1102, was likewise an express, and not an implied, statutory power. This was pointed out by the present Mr. Chief Justice White through reference (194 U. S. at pages 532, 533, 24 Sup. Ct. 756, 48 L. Ed. 1102) to section 2502 of the Ohio Statutes, which section—after reciting certain preliminary requisites contained therein and in section 2501, such as written application for leave to construct and operate a proposed street railroad, publication and competitive bidding—provided that no street railroad grant should be made "except to the corporation * * * that *will agree to carry passengers upon such proposed railroad at the lowest rates of fare*," [4] for a period of 25 years. This section of the statute, with others set out in the margin of the opinion, was there referred to as embracing all the statutes pertinent to the period involved, and as vesting "the municipal council of Cleveland with power to regulate or *to contract in respect to the rates of fare to be charged by street railways*." [5]

Further, in Home Telephone Co. v. Los Angeles, supra, 211 U. S. at pages 274, 276, 277, 29 Sup. Ct. 50, 53 L. Ed. 176, Mr. Justice Moody treated the decisions in both the Detroit and Cleveland Cases, supra, as based on statutes explicitly authorizing the cities to agree upon rates for a definite period. Similarly Mr. Justice Day relied on the Cleveland Case in the very recent decision of the Supreme Court in Columbus Ry., Power & Light Co. v. Columbus, before cited, and stated in effect that this last decision is founded on statutory authority equally explicit.

[5] The dominating principle of these decisions is that municipalities will not be regarded as possessed of the right to bind themselves to a specified public service rate and term, except only under statutes granting to them express power to contract or agree as to such rates and time, and the uniform reliance placed upon this principle in the decisions of the Supreme Court is controlling, unless a settled course of decision in the court of last resort of Tennessee requires a different conclusion. It is urged that the rule thus established as to the necessity of explicit statutory language does not prevail in the courts of Tennessee. We cannot think this accords with the decision in Knoxville Water Co. v. Knoxville, supra, 107 Tenn. 647, 64 S. W. 1075, 61 L. R. A. 888. The charter of the water company was secured under a general act. Acts Tenn. 1877, p. 127. Section 2 forbade the grant of a proposed charter until after "leave to operate" thereunder had been obtained from the particular city in which it was proposed to maintain waterworks—in this instance, Knoxville—and provided also that the act was—

"in no way to interfere with or impair the police or general powers of the corporate authorities of such city, town or village, and such corporate authorities shall have power by ordinance to regulate the price of water supplied by such company." Id. p. 129.

By section 1 of the act (Id. p. 128) companies so obtaining leave to operate were expressly empowered "to contract" with the inhabitants

---

[4] Italics ours.    [5] Italics ours.

and the corporate authorities of the city for the use of water, and to charge such price therefor as might be "agreed upon between the said company and said parties." It is clear enough that the city gave to the company "leave to operate" under, and so sanctioned a grant of, the charter, and also that it in terms entered into a contract with the company to supply water at a named maximum price for a specified time (107 Tenn. 672, 64 S. W. 1075, 61 L. R. A. 888), but in spite of the company's power thus to agree upon a price, the city's right to give or withhold "leave to operate" was evidently not regarded as implying reciprocal power in the city so to agree, and yet, according to the theory of counsel that a valid contract as to price exists in the instant case the right so to give or to withhold "leave" should have been treated in the waterworks case as implying authority in the city to submit a price for the company's acceptance as a condition of giving, instead of refusing, leave. Such a theory, however, found no recognition in the decision of that case.[6] This lack of recognition may be seen, for example, in the way the court dealt with the absence of express authority to make an irrevocable contract as to price and with the presence of distinct power by ordinance to·regulate the price. In the course of the opinion, after reviewing a number of decisions, including that of Los Angeles v. Los Angeles City Water Co., 177 U. S. 558, 20 Sup.. Ct. 736, 44 L. Ed. 886, Judge Wilkes said in the Knoxville Water Case (107 Tenn. 687, 64 S. W. 1085, 61 L. R. A. 888):

"But the difference in that [Los Angeles] case and the present is that by the charter of Los Angeles the city had the express power to make an irrevocable contract, while in this case the city of Knoxville is not by its charter granted such a right, but the proper construction of the charter is, we think, that the city shall have a continuing right to regulate the charges for water, limited only by a condition that such rates shall not be unreasonable and oppressive."

The bearing, then, of that decision upon the instant case, is the effect which was there given to the lack of express power in the city, as here, to agree upon a price. True, it is said the decision has no present relevancy, for the reason that it is only in respect of water companies that the municipalities of Tennessee are distinctly vested with power to regulate prices; but this does not escape the principle in several ways there declared touching the explicitness of language necessary to invest a municipality with power irrevocably to establish a public service price.

Further, counsel for the city rely upon certain decisions of this court in cases originating in Tennessee, and upon several decisions of the Supreme Court of that state, to show that the statutes hereinbefore set out in the margin clothed the city of Knoxville with power to sanction the contested ordinance contract of September, 1903, including the provision respecting the maximum price to be paid for gas, and, by nec-

---

[6] The reason for this must have been the fact that the power of the city to agree upon a price in the waterworks case could only have been implied, while the power to regulate was express; for, as we have seen an express power "to regulate or to contract in respect of rates of fare," although alternative in form, was upheld in the Cleveland Street Railway Case.

essary effect, also to show that statutory language expressly authorizing the city to agree upon the price was not necessary. We do not discover that such a question as this was involved in any of the cases thus relied on, certainly so far as they appear in the published reports.[7] Those cases, except that of the city of La Follette, relate to occupancy of municipal streets for either street railroad or commercial railroad purposes; but none of them presented any issue touching the right of a municipality itself to regulate or to agree upon rates, not even where its consent to such occupancy was necessary. It is particularly to be noticed, however, that in Knoxville v. Africa, Judge Lurton announcing the opinion, it was in substance held that discretionary power vested in the city to consent, or not, to street railway occupation of the public streets could not be extended to the streets generally, but was to be limited to the termini and route described in the street railroad charter. The suit against the city of La Follette was brought by the company to enforce specific performance of a contract for the supply of water and electric light for a period of 30 years. The charter provisions governing the case and the modified relief granted differ so materially from the charter and statutory provisions here involved and the relief sought as to render analysis of that case or discussion in respect of the conclusions reached below and upon appeal unnecessary.

Counsel for the city also call attention to a case decided in September, 1907, by the Supreme Court of Tennessee, Memphis Street Railway Co. v. William G. Byrne, and in which an opinion was prepared and lost, and consequently never published. It is said that the action was to recover damages for refusal of the company to accept fare from Byrne under a certain amendatory ordinance, and that this resulted in his expulsion from a car of the company. The action was sustained in the circuit court of Shelby county and judgment entered for $50; but upon a proceeding in error the Supreme Court reversed the judgment and dismissed the cause. It appears from what is said in the brief for the city, and without denial, that the record of the case is in the clerk's office of the Supreme Court of Tennessee at Jackson, and that it discloses facts substantially as follows: That the company was chartered under statute of 1875 (Acts Tenn. p. 250, § 13), which forbade the company to use any of the streets or lay rails therein until consent of the city had been obtained and an ordinance passed "prescribing the terms on which the same may be done"; that an ordinance was passed by the city, and accepted by the company in 1895, imposing conditions among which was one forbidding the company to "charge any passenger exceeding 5 cents for a single fare," but permitting council by ordinance, upon its appearing that "Memphis is entitled to a cheaper

[7] Knoxville v. Africa, 77 Fed. 501, 507, 23 C. C. A. 252 (C. C. A. 6); Railroad v. Bingham, 87 Tenn. 522, 11 S. W. 705; Smith v. Street Railroad, 87 Tenn. 626, 630, 11 S. W. 709; Railroad v Adams, 3 Head (Tenn.) 598; Railroad Co. v. Memphis, 3 Shan. Cas. (Tenn.) 198; City of La Follette v. La Follette Water, Light & Telephone Co. (D. C.) 252 Fed. 762, affirmed Id. 775, 777, 164 C. C. A. 602 (C. C. A. 6); Iron Mountain Railroad Co. v. Memphis, 96 Fed. 113, 37 C. C. A. 410 (C. C. A. 6); Memphis v. St. Louis & S. F. R. Co., 183 Fed. 529, 540, 541, 106 C. C. A. 75 (C. C. A. 6).

fare," to require the company "to sell 11 tickets for 50 cents"; and that the railroad was constructed and used until November, 1906, when the city adopted an ordinance amendatory of the first one and requiring the company "to sell 6 tickets for 25 cents, 12 tickets for 50 cents, and 25 tickets for $1"; and further that the railroad company interposed a plea based on its charter and its acceptance of the ordinance of 1895, and insisted that the ordinance and acceptance amounted to a contract. The judgment of reversal states:

"The court is of opinion that in the proceedings and judgment of the court below there is manifest error, as will appear from the opinion of the court filed in this cause."

Counsel urge that this judgment is conclusive of the question involved in the present case. What "manifest error" the opinion disclosed is left to inference, since it is not claimed that any one responsible for the statement contained in the city's brief ever saw the opinion. True, it is said that "the principal assignment of error was predicated upon the effect" of the original ordinance and its acceptance; but this implies, and the judgment shows that there was a plurality of assignments. Presumably questions arose other than the one indicated by the principal assignment; and whether the reversible error found might have grown out of one or more of these other questions becomes an important inquiry. It will be noticed, for example, that the rates prescribed by the amendatory ordinance were lower than either the maximum fare allowed by the original ordinance or the ticket rate specified in the provision thereof reserving a right to reduce the rate. Plaintiff's action must hence have depended in any event upon the reasonableness of the rates contained in the amendatory ordinance; for, apart from any question of power in the city of Memphis to agree irrevocably upon rates of fare for a period of 30 years, it was to be presumed that the rate provided in the original ordinance was reasonable at the time the ordinance was adopted, and that it would so remain until and unless it should be shown through change in conditions either (1) that the right reserved in that ordinance to reduce the rate might justly be exercised, or (2) that still lower rates—indeed, the rates set out in the amendatory ordinance—were fair and reasonable. Whether the petition alleged such a cause of action, and, if so, proof was offered below in its support, or alleged, and, if so, proof was offered below to show, a tender of fare in the form or equivalent of one or another of the classes of tickets described in the amendatory ordinance, does not appear. Thus it well may be that the error requiring reversal was the failure of plaintiff to allege and prove a cause of action under the amendatory ordinance, regardless of any question of contractual rate; as it seems to us, this is a more natural inference than the one claimed in behalf of the city. Clearly, then, upon such a record as is claimed here, it cannot be concluded that the Supreme Court of Tennessee intended to decide a question like the one presented in the instant case.

Our consideration therefore of the Tennessee cases, particularly the Knoxville Waterworks Case, convinces us that the rule of the Supreme Court of the state is in accord with the federal rule, already pointed out.

This must lead to reversal of the decree in the instant case. However, in reaching this conclusion we do not overlook counsel's claims in respect of decisions in other jurisdictions and views of text-writers which are opposed to the federal rule. The argument supporting the opposed rulings is perhaps nowhere stated more forcefully than it was by Mr. Justice Peckham in the Detroit Case before cited. We need not repeat that these views of the learned justice were not made the basis of that decision. The effect of resting the decision upon express, instead of implied, power derives controlling emphasis from the decision in Milwaukee Elec. R. v. Wisconsin R. R. Comm., supra, 238 U. S. 174, 35 Sup. Ct. 820, 59 L. Ed. 1254; for, as respects the applicable statute, pointed out in the opinion at page 179 of 238 U. S. (35 Sup. Ct. 822, 59 L. Ed. 1254), empowering municipal corporations to grant for street railway purposes "the use, upon such terms as the proper authorities shall determine, of any streets" etc., the court declared (238 U. S. 184, 35 Sup. Ct. 824, 59 L. Ed. 1254) its "inability to say that this statute unequivocally grants to the municipal authorities the power to deprive the Legislature of the right to exercise in the future an acknowledged function of great public importance"—the fixing of rates; Mr. Justice Day having previously said, as we have before shown in part (238 U. S. at page 180, 35 Sup. Ct. 822, 59 L. Ed. 1254):

"The fixing of rates which may be charged by public service corporations, of the character here involved, is a legislative function of the state, and while the right to make contracts which shall prevent the state during a given period from exercising this important power has been recognized and approved by judicial decisions, it has been uniformly held in this court that the renunciation of a sovereign right of this character must be evidenced by terms so clear and unequivocal as to permit of no doubt as to their proper construction."

True, the court gave weight to what it conceived to be a corresponding rule of the state court, but the fact remains that the Supreme Court, as also the state court, declined to construe statutory language, similar to that adduced in the instant case, as sufficient to warrant a municipality to deprive the state of is price-making power. True, also, in the Milwaukee Case the state itself, through its railroad commission, was seeking to exercise this power, while in the Detroit Case the city alone sought to exercise the power; yet these circumstances cannot affect the bearing of either of those decisions upon the instant case, for the rule as respects the necessity for explicit, not simply implied, power in the municipality prevailed in both the Milwaukee and Detroit Cases, while in the instant case this necessity cannot be met because of the total lack of express power in the city of Knoxville.

It should be added that counsel have called attention to a statute passed by the General Assembly of Tennessee since the commencement of this suit, creating a public utilities commission for the state and in terms empowering the commission upon notice and hearing to fix just and reasonable rates to be observed and followed by any utility company, including a gas company, "whenever the commission shall determine" the existing rates "to be unjust, unreasonable, excessive, insufficient, * * * howsoever the same may have heretofore been fixed or established" (Act Tenn. Feb. 21, 1919, p. 143); and also to the

fact that the parties to the present suit have recently commenced and brought to issue a proceeding before the commission, claiming and denying respectively the right of the state, through its commission, directly to change the price in issue here. While these facts signify the existence of conditions which apparently bring the rights of the parties in still closer analogy to the rights adjudicated in the Milwaukee Case as above shown, it is clear that the constitutional validity of the new statute or its effect upon the issues herein can not be passed upon in the present suit.

It has been assumed, as we have before stated, that the accepted ordinances amounted to a contract as to all matters falling clearly within the powers of the respective corporations. This mode of entering into municipal contracts is of long standing and has generally been recognized as sufficient at least in form to bind the parties. Only two features of the claimed contract are complained of; one is the exaction of a graduated percentage of gross sales of gas. It is to be presumed that this exaction was taken into account when the price was fixed and accepted for the gas to be supplied; and naturally this method will recur in any change that may be wrought in the price of gas, if indeed a change shall ultimately be found necessary and justifiable, through either an order of court or, possibly, of the state utilities commission. It need not be said again that the other complaint relates solely to the gas price. We may safely assume that this price was reasonable at the time of its adoption and acceptance. This abundantly appears through the years of acquiescence on the part of the city and the company alike. However, the present record at least in a prima facie sense discloses comparatively recent changes in conditions directly affecting the gas company both as to labor and materials which fairly justify a change, an increase in price during existing conditions. The controlling question, therefore, is, as it is stated at the opening of this opinion, whether in 1903 the city of Knoxville was clothed with power to enter into a contract irrevocably to establish the maximum price of gas for a term of 50 years. If the considerations above given to the subject are at all correct, it is perfectly plain that the question must be answered in the negative. It was consequently error in the court below to treat the provision fixing the price of gas as an irrevocable feature of the accepted ordinances. This was to ascribe to the city a contractual power which the state had not surrendered. After all, the failure of the state to confer such power on its municipalities was purely a matter of legislative policy, and hence must be accepted as conclusive.

[6] It cannot be necessary to dwell upon the question of jurisdiction. The inevitable result of persistence on the part of the city, through penal ordinance and otherwise, to enforce the price under the prima facie showing made as to existing conditions, would be to appropriate property rights of the plaintiff in violation of the constitutional guaranties it invokes for its protection.

The decree is reversed, with costs, and the cause is remanded, with direction to enter an order retaining jurisdiction of the case for further proceedings in accordance with this opinion, but without prejudice to the right of either of the parties to have the question of the price of gas determined by the state utilities commission.