## LOS ANGELES RY. CORPORATION v. RAILROAD COMMISSION OF CALIFORNIA (CITY OF LOS ANGELES, Intervener).

District Court, S. D. California, S. D.
September 10, 1928.

No. N–115.

Gibson, Dunn & Crutcher and Woodward M. Taylor, all of Los Angeles, Cal., for plaintiff.

Jess E. Stephens and Herman Mohr, both of Los Angeles, Cal., for City of Los Angeles.

Carl I. Wheat, Reginald Vaughan, and Roderick B. Cassidy, all of San Francisco, Cal., for Railroad Commission.

Before HUNT, Circuit Judge, and JAMES and SAWTELLE, District Judges.

PER CURIAM. Plaintiff's electric car tracks occupy public streets in Los Angeles under franchises granted by the city and county of Los Angeles. Its bus lines are operated under permits granted by the county. In some of the franchises for electric lines, there are provisions that the rate of fare shall not exceed 5 cents, except under a proper showing before a competent authority having jurisdiction over rates of fare that such greater rate is justified; in others, there are clauses that the rate of fare for any distance one way shall not exceed 5 cents for one passenger. A franchise ordinance adopted in December, 1924, provides, among other matters, that the grantee may operate in accordance with and limited only by the statutes of California applicable thereto, that the rate of fare for any distance shall not exceed 5 cents for one passenger, that there shall be transfers, that the franchise is granted upon each and every condition set forth in the instrument, and that a failure to comply with each and any of the conditions of the franchise would work an immediate forfeiture of all the rights granted. From and after 1910 plaintiff had charged a basic fare of 5 cents for a continuous ride in the same general direction. Free transfers, with half fares to school children and students on electric lines, and 10 cents on motorbus lines, are the only rates now charged and collected. In 1918 the plaintiff requested the Railroad Commission to make an investigation of its service and condition, with a view to stabilization of its financial affairs. In May, 1921, the Commission issued a permissive order (No. 9029) authorizing the plaintiff within 30 days to increase its basic fare to 6 cents; but by advice of Henry E. Huntington, who at that time owned all of the stock of the company, except a few qualifying shares, the authorized increase was not adopted, for the reason that Huntington believed the company could be put in a reasonably satisfactory financial condition as had been recommended by the Railroad Commission of the state. As of September 30, 1926, there had been issued 200,000 shares of common stock, of a total par value of $20,000,000 upon which dividends in bonds only, in the sum of $1,500,000, and not more, had been paid since 1911, the last payment having been made in December, 1913.

Plaintiff alleges that the plan advised was impossible, and that plaintiff at the time of the filing of the bill herein was indebted to the estate of Huntington in a sum exceeding $8,000,000; that its financial condition grew worse until November, 1926, when it applied to the Commission for permission to establish a basic fare of 7 cents, with four single fare tokens for 25 cents, and with free transfers and half fares for school children and students. In asking for the increase the company set up that the cost of money was not less than 6½ per cent., which was greater than the return possible for it to earn under the basic 5-cent fare, and that under the proposed increased fare the annual return would be less than 7 per cent. per annum. Hearings were had by the Commission, and about May 17, 1928, the company requested permission to put in effect, temporarily, a basic rate of 6 cents, pending the final outcome of the investigation into the merits of the application it had filed. In its

last referred to application the company averred that it was confronted with an emergency, in that it could not proceed with capital expenditures urgently needed, for the reason that it could not issue the necessary securities without the consent of the Commission, and that such consent could not be had until there could be a showing of adequate earnings, which, in turn, could not be presented until the rate of fare was raised, and that unless the rate was increased there would be a loss of a minimum of $2,000,000 during the year 1927. On June 20, 1927, the application was denied, the opinion of the Commission being that to what extent the company was being damaged by continuing the 5-cent fare depended upon a determination of the major issues involved in original applications. After further hearings the Commission, on March 26, 1928, made an order denying the right to increase fares, and finding, among other things, that the basic fare of five cents was just and reasonable. Rehearing was denied, and the order (No. 19521) stands.

Included in the evidence presented by plaintiff to the Commission in the course of its investigation was a detailed joint report on the valuation and financial and other conditions of the plaintiff's property in 1923, 1924, and 1925, made by the engineer of the Railroad Commission, the engineer of the board of public utilities of the city of Los Angeles, and the consulting engineer of plaintiff company. The report contained values of the plaintiff's property as of December 31, 1924, on bases for certain elements of value, provided, so the report stated, it was lawful to include such elements in a valuation. The agreed figures were: Reproduction cost new, $54,256,795; reproduction cost new, less depreciation, $39,998,891; historical reproduction cost, $41,678,050. These tabulations, carried to December 31, 1926, make total reproduction cost new, $58,796,027; reproduction cost new, less depreciation, $39,774,264; historical reproduction cost, $44,695,098. The totals just given do not include amounts for working capital or intangible items. Plaintiff avers that the report demonstrated that under existing rates its property during the years 1926 and 1927 had been confiscated to the extent of approximately $4,700,000, and at the time of the filing of this suit was being confiscated, by reason of the existence of the 5-cent fare, in a sum of not less than $7,000 per day, and that unless the fares are increased the property will continue to be confiscated in an ever-increasing amount. Plaintiff prays for an order enjoining the enforcement of the decision and order of the Commission, and thereby continuing the violation of its rights under the Constitution of the United States.

By motion to dismiss the Commission raised the question of the jurisdiction of the federal court, and whether or not the complaint states grounds for equitable relief. There was also a motion to strike a number of allegations in the complaint, on the ground that they were redundant and merely evidentiary. At the hearing before us it was suggested that, inasmuch as the motions involved the legal question determinative of the whole case, the answers, which counsel for the Railroad Commission and for the city of Los Angeles stated they had prepared, might be filed at once, and thus the merits of the controversy could be better presented to the court for final disposition. Accordingly the Commission and the city filed separate answers, and after argument the matter was submitted.

The answer of the Railroad Commission pleaded that the reason why the railway company did not avail itself of the right to increase the fare to 6 cents was that it was earning at that time a greater return upon the fair valuation of its property than was reasonable or fair; denied all material allegations of confiscation, present or probable; denied that the value of the property of plaintiff is in excess of $42,000,000, or that it was ever agreed that the alleged joint report as to valuations should control as a proper estimate; alleged that 6½ per cent. upon the value of $42,000,000 is a fair return; averred that the orders of the Railroad Commission were all in accordance with the evidence before the board, and that the financial condition of plaintiff arises from an improper and unwise policy with respect to the proportion of bonds to stock now outstanding on the system and its subsidiaries; alleged that in making up its valuation figures the railway company has included properties devoted solely to autobus service, as distinguished from street car service; that the bus fares are upon a higher and greater plane than the street car fares, and that an increase in the street car fares, without an existing increase in bus fares, would create an unfair discrimination as between plaintiff's patrons and classes of patrons; that plaintiff's system to a large degree is antiquated in the various respects pointed out in the answer.

The answer of the city of Los Angeles, intervener, as party defendant, is in most material respects substantially like the an-

swer filed by the Railroad Commission. It also pleaded the terms and conditions of franchises granted to the plaintiff, by some of which the rate of fare for any distance one way should not exceed 5 cents for one passenger, and alleged that a certain number of the franchises provide that the rates of fare shall not exceed 2½ cents per mile for any distance, provided that no fare be less than 5 cents; that a certain number of franchises limit the fare to 10 cents, with power in the board of supervisors to establish at any time a fare not exceeding 10 cents and not less than 5; that one franchise provided that the rate should not exceed 3 cents per mile; that all the franchises granted by the city were granted in accordance with the provisions of the Constitution of California, and the general laws of that state, and the charter of the city of Los Angeles, and ordinances duly passed; that subsequent to March 2, 1920, certain franchises contained limitations providing a change in cost of 5 cents, except where such change might be made by consent of an authority with power to make a change.

We can dismiss the several motions to strike portions of the complaint by saying that while, doubtless, there are some allegations of unnecessary facts, and some averments which, construed strictly, may be objectionable as merely evidential, nevertheless the whole complaint gives to the court an understanding of the material facts and conditions upon which the plaintiff rests its contention that, by requiring operation under the present fares, its constitutional rights have been and are being, and, unless relief be given, will continue to be, invaded and infringed. We, therefore, overrule the motions to strike, and pass to the more important grounds included in the motions to dismiss and the answers.

■ Upon the jurisdiction of the federal court, it is enough to say that, when the facts show that a court of the United States has jurisdiction, the duty of the court is to take jurisdiction, and, where one has a case within the jurisdiction of the federal tribunal, his right to choose a federal court cannot properly be denied. Willcox v. Consolidated Gas Co., 212 U. S. 19, 29 S. Ct. 192, 53 L. Ed. 382, 48 L. R. A. (N. S.) 1134, 15 Ann. Cas. 1034.

■ No one at this day will dispute the power of a state to regulate the conduct of railways within the borders of the state, acting through a board or commission whose duty it is to accomplish such regulation; but in the recognition of such power of regulation by the state over common carriers, and in accord with the scope of such power, the Supreme Court has distinctly laid down the rule that the property of the railways is under the protection of the fundamental guaranties of the Constitution, and is, therefore, justly entitled to the protection of the law, and there is no power under which such property can be taken from its owner without just compensation, or without due process of law. Wisconsin, etc., Co. v. Jacobson, 179 U. S. 287, 21 S. Ct. 115, 45 L. Ed. 194. And closely applicable to the case under consideration is the principle that, if the power of regulation by a state commission is exercised in such an unreasonable manner as to prevent the carrier from obtaining a fair return upon the property invested in the public service, it passes beyond lawful bounds, and the action in the exercise of the power is void, because repugnant to the due process of law provision of the Fourteenth Amendment to the Constitution. Mississippi R. R. Com. v. Mobile & Ohio R. R. Co., 244 U. S. 388, 37 S. Ct. 602, 61 L. Ed. 1216.

■ Section 67 of the California Public Utilities Act (St. 1915, p. 115) provides that, within 30 days after petition for rehearing is denied by the Railroad Commission, the applicant may apply to the Supreme Court of the state for a writ of review, but that in the Supreme Court the case shall be heard upon the record of the Commission, and the review can go no further than to determine whether the Commission has regularly pursued its authority, including a determination whether the order violates any right of the petitioner under the Constitution of the United States or of the state of California. The statute makes the findings and conclusions of the Commission on questions of fact final, and not subject to review, and requires that upon the hearing the Supreme Court shall enter judgment either affirming or setting aside the order of decision of the Commission. That the review contemplated by the statute is judicial in its character has been determined by the Supreme Court of the state in Pacific Tel. & Tel. Co. v. Eshleman, 166 Cal. 640, 137 P. 1119, 50 L. R. A. (N. S.) 652, Ann. Cas. 1915C, 822, and Napa Valley Elec. Co. v. Railroad Commission (D. C.) 257 F. 197, and same case in 251 U. S. 366, 40 S. Ct. 174, 64 L. Ed. 310. It therefore seems certain that, if the plaintiff in the present action had sought review of the order of the Commission before the Supreme Court of the state, and that court had annulled the order of the Commission, plaintiff would have been obliged to proceed anew before the Commission or to seek a writ of error to.

the Supreme Court of the United States, in which event, were plaintiff successful, it would have been obliged again to proceed before the Commission.

But such procedure was not the only avenue through which relief might be sought, for, when the Commission made the order denying plaintiff's right to increase its fares, the proceeding being judicial, the company could resort to any court having jurisdiction to afford relief. Prendergast v. New York Tel. Co., 262 U. S. 43, 43 S. Ct. 466, 67 L. Ed. 853. In R. R. Commission v. Duluth St. R. Co., 273 U. S. 625, 47 S. Ct. 489, 71 L. Ed. 807, the court considered the one question whether the street railroad company had the right to go into the federal court when it did, and whether its suit was premature because of the state statute allowing an appeal to the Supreme Court of the state from the order of the state Commission, and held that it should be remembered that the requirement that state remedies be exhausted "is not a fundamental principle of substantive law, but merely a requirement of convenience or comity." It follows that, if there is a clear showing that the rates to which the company is confined are confiscatory, the duty of the federal court is to issue injunction.

The city would avoid the applicability of these general principles by contending that, although admitting the franchise rates are subject to change by the state Railroad Commission, nevertheless the franchises are contracts between the parties, and that therefore no substantial federal question is presented, and the federal court is without jurisdiction to grant plaintiff the injunctive relief it asks. Briefly answering this contention, we think it may well be doubted whether the state of California ever delegated power to the city to contract with a public utility on the subject of rates, so as to restrict future regulation. Since the adoption of article 12, § 23, of the Constitution of the state on November 3, 1914, the entire control over rates of public utilities has been expressly reserved to the Railroad Commission, from the time of the creation of that commission. By that constitutional provision municipalities were divested of all power over rates. The article provided that, from the time of the passage by the Legislature of laws conferring power upon the Railroad Commission respecting public utilities, all powers respecting such utilities vesting in boards of supervisors or municipal councils of the several cities in the state should cease, so far as such powers might conflict with the powers conferred upon the Railroad Commission, provided that the section should not affect such powers of control over public utilities as relate to the making and enforcement of local and police regulations "other than the fixing of rates vested in a city," and provided, further, that where any such city shall have elected to continue any of its powers to make and enforce such local regulations other than the fixing of rates, it might thereafter by a vote of its qualified electors surrender such powers to the Railroad Commission, and provided, that the section of the Constitution referred to should not affect the right of any city to grant franchises for public utilities upon the terms and conditions and in the manner prescribed by law.

Section 497 of the Civil Code of California (amended St. 1891, p. 12), provides that authority to lay railroad tracks through streets of a city could be obtained for a term of years not exceeding 50, from the council under such restrictions and limitations and upon such terms as the city might provide. By the Franchise Act of 1893 (Stat. Cal. 1893, p. 288) a franchise to construct or operate railroads upon any public street of a city, or to exercise any other privilege proposed to be granted by the common council, shall be granted upon the conditions of that act, and not otherwise. We perceive no provision in that act by which power is given to the city over rates to be included in any franchise granted. Stat. 1901, p. 265, and its amendments provided that municipalities could grant franchises upon the conditions in the act provided and not otherwise, but there were no words expressly delegating power to a city to fix rates by contract, and, as said by the Supreme Court in Home Tel. & Tel. Co. v. City of Los Angeles, 211 U. S. 265, 29 S. Ct. 50, 53 L. Ed. 176, the first section of the act contained "an emphatic caution against reading into the act any conditions" not clearly expressed in the act itself. No decisions of the Supreme Court of the state directly decide the question, and we pass it, merely saying that we are inclined to the view that, in the absence of an express grant to the city of power to fix binding rates in franchises, no such power exists; nor can it be implied under the language of the act of 1901, or other statutes called to our attention. Stanislaus County v. San Joaquin & K. R. Canal Co., 192 U. S. 201, 24 S. Ct. 241, 48 L. Ed. 406; City of San Antonio v. San Antonio Public Service Co., 255 U. S. 547, 41 S. Ct. 428, 65 L. Ed. 777; San Francisco-Oakland Terminal Co. v. City of Alameda (D. C.) 226 F. 889; Knoxville Gas Co. v. City of Knoxville (C. C. A.) 261 F. 283.

It is perfectly clear, we think, that, at least since the adoption of the constitutional provision heretofore cited, any provision with respect to rates in franchises granted since 1914 could not be considered as binding contracts of inviolable nature.

Denney v. Pacific Tel. & Tel. Co., 276 U. S. 97, 48 S. Ct. 223, 72 L. Ed. 483 (decided February 20, 1928), involved· an order of the Department of Public Works of Washington, finding that existing rates charged by the telephone company were just, fair, and reasonable, and that certain proposed increased rates were unjust, unfair, and unreasonable, and that the application for increased rates should be denied. The court stated that the Department of Public Works had made its investigation without regard to the franchise rates which designated maximum permissible rates, thus disregarding the contention that the franchise rates were contractual, and therefore could not be confiscatory in a constitutional sense. The court affirmed the view of the Supreme Court of the state, that the questions presented were unaffected by the franchise rates, · and held that the public body had the power to fix reasonable and compensatory rates, irrespective of any previous municipal action.

█ We prefer to rest our decision upon the ground that, even upon the assumption that the city had power to fix the utility rate by contract, and that the rate provisions contained in the franchises granted to plaintiff did constitute contracts, nevertheless,· the rates specified in the provisions of the franchises have been changed by the exercise of the police power of the state. It appears that in 1921 the Commission granted plaintiff company authority to increase its rates over the basic 5-cent fare which was then in force. There were in force and effect at that time 102 out of 116 franchises granted to plaintiff or its predecessors. Since May, 1921, 14 other franchises have been granted. When the Commission in 1921 made its order changing the basic 5-cent fare, it authorized plaintiff to file with the Commission, and put into effect 30 days from the date of the order, a schedule of rates increasing the then-present basic fare of 5 cents to 6 cents, and directed that tickets or tokens be put on sale. That plaintiff company did not avail itself of the right to the increase does not affect the fact that the Commission exercised its exclusive jurisdiction to regulate rates, by making and finding that the rates provided for in the franchises granted to plaintiff were inadequate, and that the 6-cent fare authorized was a just rate. The Commission in its decision said:

"If adequate street railway service is to be given in Los Angeles, there appears to be no possibility for the company to secure the necessary revenue under a continuation of the flat 5-cent fare. An increase in the fare in some form, we are satisfied, should be authorized, if street railway service is not to suffer and great injury is not to result to the development of the city." 19 C. R. C. 999.

The order authorized the company to put into effect within 30 days from the date of the order a schedule of rates increasing the basic 5-cent fare to 6 cents, provided that tickets or tokens be put on sale at the company's offices, on the company's cars, and at such points as the company may select, .in blocks of 10 tickets or tokens at a total cost of 50 cents for each block, and provided further that the single 6-cent fare, as also the reduced rate ticket or token fare, shall retain transfer privileges as then in existence.

Furthermore, we are of opinion that the proceeding before the Railroad Commission (No. 13323), out of which the present suit grew, must be held to have been a complete exercise by the Commission of its power over the rate specified in the franchises granted to plaintiff. How could it be otherwise? The Commission received and considered original and supplemental applications for an increase made by plaintiff. It carried on an extensive investigation, lasting from November, 1926, until March, 1928, when it made its finding that the 5-cent fare allowed to plaintiff was not an unreasonable return, and that under that rate, and the method of operation for the year ending December 31, 1927, the return was approximately 4.9 per cent. The finding of the Commission rested upon detailed figures concerning the valuation of plaintiff's property. The practical result of the conclusion and order of the Commission was to prevent the company from obtaining a fair return upon its property invested in the public service. Its order was none the less effective in denying permission to raise an existing rate, inasmuch as the necessary effect was to enforce the existing rate, which would effect confiscation of plaintiff's property. Mississippi R. R. v. M. & O. R. R., 244 U. S. 388, 37 S. Ct. 602, 61 L. Ed. 1216.

We therefore hold that the denial of permission to raise the existing rate, followed, at it was and is, by the necessary effect of en-

forcing the rate, was an exercise of jurisdiction, and that a situation was created wherein the power of the federal court to enjoin, if confiscation is effected by the order, is ample.

Let us briefly look at the facts as set forth in the pleadings, and the exhibits made parts thereof, which included the evidence before the Commission.

We accept as a criterion the rule approved in Smyth v. Ames, 169 U. S. 466, 18 S. Ct. 418, 42 L. Ed. 819, that the basis of all calculations as to the reasonableness of rates to be charged by a carrier, such as plaintiff is, must be the fair value of the property being used by it for the convenience of the public, and that, in finding such value, among the principal proper elements to be considered are "original cost of construction, the amount expended in permanent improvements, the amount and market value of its bonds and stock, the present, as compared with the original, cost of construction, the probable earning capacity of the property under particular rates prescribed by statute, and the sum required to meet operating expenses." Those elements, together with amounts to pay taxes and proper operating charges, and any going concern value that there may be, are essential to be considered in arriving at a conclusion upon the all-important question whether the carrier is enjoying a fair return upon the value of the property employed by it for public convenience. What, therefore, was established as the reasonable value at the time of the investigation by the Commission, and what may be taken to be such value for a reasonable time in the immediate future? San Diego Land Co. v. Jasper, 189 U. S. 439, 23 S. Ct. 571, 47 L. Ed. 892; McCardle v. Indianapolis Co., 272 U. S. 400, 47 S. Ct. 144, 71 L. Ed. 316.

Expert evidence in plaintiff's behalf, based in large part upon the inventory and values made by concurrent action heretofore mentioned in 1923 and 1925, computed the total values as of December 31, 1926, and December 31, 1927, as follows:

For 1926: Reproduction cost new, less depreciation, straight line basis, $45,217,653; reproduction cost new, less depreciation, 70 per cent. condition, $46,129,344; historical reproduction cost, $49,240,186.

For 1927: Reproduction cost new, less depreciation, straight line basis, $46,231,320; reproduction cost new, less depreciation, 70 per cent. condition, $47,137,964; historical reproduction cost, $50,435,823.

Items included in the valuations are operative physical property, capital expenditures called for during the 18 months following the dates of the valuation, working capital, and a going value. The defendant Commission filed an affidavit, made by one of the engineers (Cooper), who had had long and varied experience in making valuations of public utilities, and had participated in the so-called joint report of valuations from 1923 to 1925, which was before the Commission in the rate proceeding, respecting rates of the plaintiff carrier (application 13323). His computations vary from those made by plaintiff's witnesses. He put the value at $41,914,052, and included allowance for material, supplies, and future capital expenditures, based upon historical reproduction cost, which included estimated market value of the land as of the date of the valuation, plus the estimated cost of the other physical property at the time of the installation of the various items, plus overhead expenditures for engineering, law, interest, and similar charges. In his estimate he took $42,000,000 as the highest figure to be accepted as a rate basis, and calculated the net income and per cent. return derived from the operation of plaintiff's street railway and bus system from 1922 to 1926, as follows:

| Years. | Net Income. | Per Cent. Return. |
| --- | --- | --- |
| 1922 | $3,043,669 | 9.7 |
| 1923 | 3,278,232 | 9.4 |
| 1924 | 2,879,307 | 7.4 |
| 1925 | 2,090,910 | 5.2 |
| 1926 | 1,910,466 | 4.6 |

It is true that during the argument plaintiff vigorously contended that the Commission failed to give due weight to the evidence before it as to depreciation of plaintiff's various properties, and that it adopted an arbitrary historical reproduction cost estimate as of December 31, 1926, wherein there was no inclusion of allowances for working capital, going concern, development cost, or adequate allowances for interest during a reasonable construction period—contentions which appear to be justified, at least in part, by the evidence of Mr. Cooper produced before the Commission, to the effect that in his grand totals he had not included working capital, going concern value, nor additional capital required, but had merely covered physical properties as of December 31, 1926. But, in denying plaintiff's petition for rehearing, the Commission expressly stated that, in reaching its conclusion as to a fair rate basis figure, it had considered all the evidence and claims of value, and had made a fair allow-

ance for "claimed intangible elements of value in the light of all the surrounding circumstances," and added that a fair allowance for reproduction costs new, less depreciation, would, "with fair allowance for all intangible items," amount to a sum less than that found as a rate basis.

It is to be regretted that the Commission did not go into particulars in its reference to the wide variation in the estimates before it pertaining to the intangible items. However that may be, we need not enter into a detailed inquiry whether or not the Commission included all of the items which Mr. Cooper says he did not consider, or any of them, as among the elements of value, or whether such items, or any of them, were essential in arriving at a fair value of the property, for the theory upon which the defendant rests its contentions is that the Commission did consider all of the proper factors in exercising its judgment as to the fair value of the property for rate-making purposes. With that understanding, we stated to counsel upon the argument our general view that the analysis of facts and figures made by plaintiff was not sufficiently persuasive to compel a conclusion that the Commission had erred, by omitting to give consideration and due weight to the factors which fundamentally entered into an ascertainment of the value of the property.

Since the case has been submitted, and we have studied the record, we now hold that the findings of the Commission fixing the rate basis at $42,000,000 must stand. These findings were in effect that the financial results of the operation of plaintiff's property under the operating methods in use for the year 1927, based upon the estimates which were before the Commission, were as follows: Total operating revenues, $13,254,-000; total operating expenses, including depreciation, computed on 5 per cent. sinking fund basis and taxes, $11,183,739; leaving net income available for return, $2,070,261. It also found that the rate of return under the fares and methods of operation of the year 1927 was approximately 4.9 per cent. Now, if we take operating expense allowance for depreciation as made by the engineers of the Commission, computed on the same basis as the computation for the deduction of accrued depreciation from the value of the property, the following table illustrates the fare required to produce sufficient revenues to meet total cost of service, including return of not exceeding 8 per cent. on the value of operative property, as fixed

by the Commission for say one year next after the rates go into effect:

| | |
|---|---:|
| (a) Minimum operating expenses, exclusive of depreciation and taxes, for first year after new rate takes effect | $10,274,760 |
| (b) Operating expense of depreciation, as estimated by Commission's chief engineer, A. G. Mott, and assistant engineer, J. E. Cooper | 1,556,917 |
| (c) Taxes | 1,229,686 |
| (d) Total operating expense, not including return, items (a), (b), and (c) | 13,061,363 |
| (e) Total cost of service, including 8 per cent. return | 16,421,363 |
| (f) Gross revenue estimated to be produced by straight 7-cent fare, without reduced tickets or tokens | 16,031,171 |
| (g) Straight 7-cent fare will produce net income available for return of (f) minus (d) | 2,969,808 |
| (h) Plaintiff's estimated income, other than for transportation | 130,000 |
| (i) Total net income available for return under straight 7-cent fare, item (g) plus (h) | 3,099,808 |
| (j) Total net income under straight 7-cent fare will fall short of producing full 8 per cent. return on $42,000,000 by.... | 260,192 |
| (k) The total net income available for return under straight 7-cent fare (i) is equal to a rate of return | 7.38% |

Obviously, by use of tokens as applied for by plaintiff in its application, the net income available for return will be considerably less.

We do not believe there is merit in the suggestion that there is discrimination asked, in that the estimates of value included in plaintiff's statements comprehend bus operations, which showed a loss for the year 1926. The complaint treats the plaintiff's public utility as a "street railroad corporation," operating a "unified passenger transportation system," consisting of double and single track railway and motorbus lines, etc., and in the rate base of $42,000,000 in the Commission's decision and order there was included all of the property of the plaintiff company devoted to its bus operations. It is evident that the Commission treated the property of plaintiff devoted to its bus operations as entitled to be considered in any rate-base finding of value.

Our conclusion is that plaintiff has shown very clearly that the finding of the Commission that the present rate is fair and reasonable is not supported by the evidence before the Commission, and that plaintiff's property is being confiscated, and that our power should be used to afford relief. Northern Pac. R. Co. v. Dept. Public Works, 268 U. S. 39, 45 S. Ct. 412, 69 L. Ed. 836.

Let the injunction issue, with order that plaintiff company issue a refund coupon to all patrons paying fare, and that it give bond in the sum of $50,000, to be approved by the judges, providing that, if it shall ulti-

mately be held that the new rate is unlawful, the excess represented by the coupon will be refunded upon presentation of the coupon.

Counsel may submit form of injunctive order.

### Order for Decree.

In this cause, the application of plaintiff for an interlocutory injunction having been presented to the court, and evidence having been submitted by the parties, and argument of counsel, both oral and by briefs, having been made, and the parties having stipulated in open court that the hearing so had be considered as a trial of the issues, and that final decree on the evidence heard be made herein, the judges of the court having agreed upon their decision, and having expressed their conclusions in a written opinion, which is appended hereto, it is now ordered that said opinion be by the clerk filed.